Draper v. The State.

The record does not show that any objections were made to the admissibility of evidence; nor does it show what evidence was admitted. The assignment of error, in relation to the admissibility of evidence, is, therefore, not entitled to any consideration. We have no reason to doubt that the justice of the case has been attained, and the judgment is therefore affirmed.

Judgment affirmed.

---

### JAMES DRAPER V. THE STATE.

Where A and B (who were soldiers) were shown to have started from camp, about ten or eleven o'clock in the morning, in company with C, to guide him into a trail, by which he could save some eight miles of travel upon the main road; and were seen with C about three quarters of a mile from the fort, going in the direction of the trail, and about the same distance from where the remains of C were afterwards found, and where he was apparently murdered; and it was also shown, that A and B returned to camp about three o'clock of that day, and that C had not been heard of subsequently; and that A, when he heard that he was charged with the murder of C, left camp without permission, going in the direction that B had that morning gone, and met, and had a long private conversation with B, and then returned to camp with him; and that A, when asked, denied having gone with C, when he left the fort, but when shown the shirt and skull found at the place of the murder, was much excited, and after a few minutes, said, "I did not go over the hill with C; I know nothing about it:" *Held*, by the court, that there were no such circumstances of a common design between A and B, as would authorize the admissibility of A's declarations, as those of a co-conspirator.

The general rule of law is well settled, that a man's confessions of guilt, can only be used against himself.

If improper testimony, which may have influenced the jury, have been received, the court cannot look to the whole case, to determine whether or not there be other testimony sufficient to establish the defendant's guilt.

The defendant is entitled to the verdict of a jury, upon competent testimony alone.

APPEAL from Bexar. Tried below before the Hon. Thomas J. Devine.

That no other credit was endorsed on said execution, than that of $179 01 aforesaid; that Lovett and Pennell were insolvent; and that on the 29th day of October, 1857, an alias pluries execution issued, on said judgment, against said Lovett and Pennell, and petitioners, in favor of the plaintiffs therein, for the full amount, less the credit endorsed thereon as aforesaid, notwithstanding said levy and payments, fully satisfying the execution and judgment.

That said deputy sheriff took said $635 from the possession of Tinsley; that it should have been applied to the full satisfaction of the execution, and was, *ipso facto*, a discharge of the execution and judgment; and that the return by the sheriff, of said execution, not satisfied, by order of plaintiff's attorney, Horatio S. Parker, and the direction, by said attorney, to return the same not satisfied, were in violation of petitioner's rights. Prayer for injunction against the execution aforesaid, in the hands of the sheriff, and against all further proceedings under said judgment; also, for process, and general relief.

Fiat granted January 26th, 1858.

The answer of defendants denied that the money paid by Tinsley to Lewis, was the property of Lovett, or subject to attachment or levy for the debts of Lovett; and alleged that said money was collected by, and in the hands of Tinsley, on a judgment in favor of said Lovett or Pennell, which judgment had been assigned to H. S. Parker, by a transfer upon the execution docket, on or about the 12th day of July, 1857; that Tinsley knew that the money, when collected, was payable to Parker, and that he promised to pay the same to him, on or about the first of January, 1857; that the money, so paid to Lewis, was to be first applied to the payment of said case of Lovett or Pennell et al., (assigned as aforesaid to Parker,) and the balance on the said execution in favor of Carey, Reese & Co., (plaintiffs in the execution, sought to be enjoined;) and that the sheriff made the calculation, and after satisfying said judgment, applied the balance to Carey, Reese & Co., amounting to $179 01; that if Lewis gave a receipt for

more, it was by mistake, and not correct; that the executions were sent to Bastrop county, for the benefit of and at the urgent request of Tinsley and Branch, and the defendants were assured that, by so doing, the money would be collected on the same. (This part of the answer referred to the execution on the judgment assigned to Parker, which the facts showed was a judgment in favor of Lovett against J. W. Pennell and J. T. Tinsley, and from which a part or all of the $635 was raised.)

The answer admitted the truth of the allegations made in the petition, in reference to the statements of judgments, and the issuance of executions.

Jury waived, and case submitted to the court. Executions, referred to in petition, issued on the judgment in favor of Carey, Reese & Co., introduced in evidence ; and the endorsements, on that issued January 9th, 1857, showed a credit endorsed by the sheriff of $179 01, as set out in the petition, and an order, dated January 19th, 1857, signed by H. S. Parker, attorney for plaintiffs, and directed to the sheriff of Gonzales county, in whose hands the execution then was, to return the execution *not satisfied ;* and of the same date was endorsed as follows on the execution : "This execution is returned by order of the plaintiff's attorney." Signed by the sheriff. The other execution, which was enjoined, had endorsed on it, the above named credit, and no other ; it was issued for the sum of $595 76, with interest thereon.

It was proven by Lewis, deputy sheriff, that Tinsley, one of the defendants in the execution, about the 19th day of January, 1857, handed him something over $600, and more than sufficient to satisfy the execution; that it was money received from the sheriff of Bastrop county, collected in the case of Lovett v. Pennell, Tinsley et al. That Tinsley ordered him to levy on the same, in the case of Carey, Reese & Co. v. Lovett, Tinsley, Branch and Pennell ; which execution he stated he then held in his possession; that he took the money, and passed it over to the sheriff, Harris, together with the execution.

It was proven that Tinsley received money from the sheriff of Bastrop county, in the month of January, 1857. The amount

Carey v. Tinsley.

was more than sufficient to satisfy the execution in favor of Lovett. Witness, Bouldin, who was present when he received the money, stated that it was his understanding, that the judgment in favor of Lovett was first to be settled, and the balance to be applied by him, (Tinsley) to the benefit of Carey, Reese & Co., on an execution in their favor against Pennell, Lovett and himself. Said witness heard a conversation between H. S. Parker, attorney for Lovett, and Tinsley, in reference to the getting for, or paying to Parker, the money due on the judgment in favor of Lovett: this conversation was some time in December, 1856, and Tinsley was to have one month within which to get the money. Tinsley promised to pay the same to Parker within the month. Parker then informed Tinsley, that the money due on that judgment was coming to him, and Tinsley promised to pay it over to him. Afterwards, Tinsley referred, in conversation with witness, to the fact, that he was a witness to his promise to pay the money received, to Parker, and that he intended to do so. Bouldin also stated, that he learned from the conversation between Parker and Tinsley, that the former was acting as Lovett's attorney; and was also to receive the said money, in his own right, because he had himself advanced the money to Lovett.

The execution in favor of Lovett, against Pennell and Tinsley, was issued to Bastrop county, on the 10th day of November, 1856, for the sum of $1,230 51, with interest from May 2d, 1855, and credited by $791 92, paid 5th April, 1856. Endorsed " satisfied, the 16th day of January, 1857, and amount paid over to order."

The transfer of the judgment, on which the last named execution issued, from Lovett to Parker, was proven, dated January 12th, 1857. It was also proven, that the $600 was paid over to Harris, the sheriff, and by him paid to H. S. Parker.

Judgment of the District Court for the plaintiffs. Injunction perpetuated as to Tinsley and Branch, and not as to Pennell and Lovett.

*H. S. Parker*, for appellants.

*Stewart*, for appellees.

ROBERTS, J.   The appellees seek to enjoin the judgment of appellants, upon the ground, not that Tinsley, being one of the defendants therein, had paid the money to the sheriff, but that he, being in possession of the money, delivered it to the deputy sheriff, and directed him to levy upon it as the money of Lovett, who was also a defendant, and one of his principals, in the judgment.

The question is, did Tinsley have possession of the money in such way as to make it liable to a levy in his hands?

The evidence shows that he received the money for Parker, and that he was Parker's agent, and not Lovett's agent, to receive the money from the sheriff of Bastrop county, who had collected it on the judgment in the case of Lovett v. Pennell and Tinsley.   Parker was Lovett's attorney in controlling this judgment, and also had an assignment, in his own favor, of the money to be collected on the judgment; and Tinsley had been authorized by him to receive this money from the sheriff of Bastrop county, and he (Tinsley) had been apprised of Parker's claim, and promised to pay it over to Parker.   Tinsley being defendant in both judgments, it was to his interest that this money, after satisfying one (that of Lovett v. Pennell and Tinsley) should be applied to the payment of the other, in which he was surety, (Carey, Reese & Co. v. Lovett, Pennell, Tinsley, and Branch.)

His possession of the money was that of Parker, being merely his agent, to receive and bring to him the money collected on the Lovett judgment, from the sheriff of Bastrop county.   The money being delivered over by the deputy to the sheriff, together with the execution, he had a right not to levy upon it, if he found it was not subject to levy, under the circumstances under which it came into the hands of his deputy.   And as he did not endorse a levy upon the execution, we must presume that he

did determine not to treat it as money levied on by him, but to deliver it over to Parker, as the person entitled to its possession. If he determined right in that matter, Carey, Reese & Co. were not bound to move against him, for not levying on the money thus placed in his hands, for levy, as the property of Lovett.

There is no evidence that Tinsley, acting for Parker, in receiving and conveying this money, had his permission to deliver it to the sheriff as Lovett's money, to be levied on; but, on the contrary, Tinsley had promised to deliver it to Parker, and had been apprised that Parker claimed it as his own, for advances made to Lovett. The sheriff, then, upon ascertaining, as we may presume he did, from the evidence before us, that Tinsley had no such authority from Parker, and that Parker was entitled to the possession of the money, as assignee of Lovett, took the responsibility to deliver it to Parker, and to decline levying upon it, as property of Lovett, subject to levy.

From the evidence before us, we are of opinion he did right.

There is nothing in the case to impeach the transfer of the claim from Lovett to Parker.

There is a receipt of the deputy sheriff, for two hundred and twenty five dollars, claimed as a credit on the judgment in favor of Carey, Reese & Co., which is alleged by them to have been given by mistake. There is no certain evidence, whether this should be credited on the judgment or not; and therefore there are no certain *data* upon which to render a judgment.

The judgment will be reversed, and the cause remanded for further proceedings.

Reversed and remanded.

## THOMAS McKEY'S HEIRS v. JOHN WELCH'S EX'X.

One joint-tenant, or tenant in common, cannot convey a specific part of the estate, so as to bind or prejudice his co-tenant; yet such conveyance may bind the vendor, by way of estoppel.

It is not competent for the court to render a decree, in favor of a party, if, in the pleadings, there be no basis or prayer for such relief; and consequently, where the plaintiff brought an action of trespass to try title, to which the defendant pleaded not guilty, and it was found by the jury, upon the issue presented by the charge of the court, that the defendant had purchased the land claimed by him from a co-tenant, (who had purchased a part of the interest to which one of the plaintiffs was entitled,) the court erred in decreeing to the defendant the amount of land claimed by him, to be taken out of the portion which the plaintiff, through whom he claimed, should receive upon the partition of the entire tract among the plaintiffs.

APPEAL from Hill. Tried below before the Hon. John Gregg.

This was an action of trespass to try title, brought in the court below by the appellants, heirs of Thomas McKey, deceased, against John Welch, to recover two labors of land, being a part of the colony headright of said Thomas McKey, deceased. The facts, as shown by the record, were, that Thomas McKey, in September, 1835, obtained from the government a title for a league of land, lying on the Brazos river, and shortly after died, leaving Sally McKey, his widow, and the other plaintiffs, his children and heirs at law. During the pendency of the suit, Welch died, leaving Jedida, his widow, executrix, who was made a party to the suit.

The defendant pleaded "not guilty," suggested settlement in good faith, and claimed compensation for improvements, &c. Defendant also pleaded, specially, that in August, 1837, after the death of Thomas McKey, Sally McKey, his widow, sold and conveyed to one Massillon Farley, two labors of land, part and parcel of the headright of said Thomas McKey, to be selected by said Farley on any part of the league, provided such location should be upon one of the bound-

ary lines of said league; that afterwards, in the year 1845, Farley made a selection, and located the said two labors in the corner of the league, having the northern line of the league for one boundary, and the Brazos river as the western boundary; and that in March, 1852, Welch purchased the said two labors of land of Massillon Farley, and took possession of the same.

The title to the league from government to Thomas McKey, the conveyance from Sally McKey to Farley, the selection and location of the two labors by Farley, and the conveyance by Farley to Welch, were all given in evidence to the jury, and the heirship of plaintiffs was also proven. There was testimony showing that a portion of the purchase money, from Farley to Mrs. McKey, was unpaid; and also other testimony, in relation to the amount and value of improvements made by Welch; and also whether Welch made the improvements, with or without the consent of plaintiffs.

The court charged the jury, "that the title paper offered in " evidence, by plaintiffs, establishes the fact, that the land in con- "troversy was granted to Thomas McKey; and his death being "established, his wife and children (the plaintiffs) succeeded him "in the title; and by the action of the law, Mrs. Sally McKey, " at the death of Thomas McKey, became the owner of one undi- "vided half of said league of land, and the children of said "Thomas McKey, deceased, became the owners of the other un- "divided half. If, then, Sally McKey, the widow, made the con- "veyance to Massillon Farley, and the said Farley conveyed to " John Welch, the jury would find such fact specially, and make a " computation of whatever purchase money remained due. If they "believe, from the testimony, that any sum is still due, on the "contract between said Sally McKey and Farley, the jury will " allow interest at five per cent, from the maturity of the note, "up to the 16th March, 1840, and after that time, allowing "interest at the rate of eight per cent. The jury will also "state, in their verdict, how much money has been paid by "Farley. If the jury believe, from the testimony, that John "Welch made improvements upon the land in controversy, they

"will find whether he made them by the consent of the plaintiffs "or not. If he made them by their consent, they will so state "in their verdict, and find the value of such improvements. If "the jury believe, from the testimony, that the improvements "were made against the wish, or without the consent of the "plaintiffs, they will so state in their verdict. If the jury be-"lieve, from the testimony, that Sally McKey conveyed to M. "Farley, and Farley conveyed to John Welch, they well state "in their verdict, how much of the land was so conveyed. If "the jury do not believe that Sally McKey ever conveyed to "Farley, they will find for the plaintiff, and say so, without "stating any other fact. The jury are required to pass upon "all the facts mentioned in the foregoing charge, so as to show "the entire history of the case, as shown by the testimony; but "they need not pass upon any fact, to which their attention is "not called in the charge."

The plaintiff asked the court to charge the jury, "that if the "jury believe, from the testimony, that Sally McKey sold the "land to Farley, after the death of Thomas McKey, and before "a partition among the heirs, they would find for the plaintiffs." This charge was refused by the court.

The jury returned the following verdict: "we the jury find that "Sally McKey made a conveyance of two labors of land, out of "the headright of Thomas McKey, to Massillon Farley; and that "Massilon Farley conveyed said land to John Welch; and that "there is yet unpaid, on purchase money, forty seven $\frac{25}{100}$ dol-"lars, and interest on same, up to this date, $70 25; and that "John Welch made the improvement contrary to the wish of "the heirs of McKey; and that Thomas McKey was dead at "the time the deed was made by Sally McKey to Massillon "Farley."

Upon this verdict, the court rendered judgment in favor of plaintiffs, for the sum of $117 50; which, being tendered by defendant, and refused by plaintiff, was ordered to be deposited with the clerk, subject to the order of the court. The decree then proceeded: "it is further ordered, adjudged, and decreed

"by the court, that the defendant have and recover of Sally "McKey, and the heirs of Thomas McKey, two labors of land, "to be selected from the half of the headright league of land "granted to Thomas McKey, and inherited by said Sally "McKey from Thomas McKey, deceased, that may hereafter "be partitioned between the widow and children of .Thomas "McKey; and that said two labors of land be taken from one "of the boundary lines of said Sally McKey's half of said "league." The decree adjudged that each party pay the costs occasioned by them respectively, and that the decree be certified to the Probate Court.

From this decree, the plaintiffs below took an appeal to this court, and assigned for error,—1st. The court below erred in its charge to the jury, as to the payment of the purchase money due from Farley to Sally McKey. 2d. In compelling plaintiffs to receive the purchase money, found by the jury, and decreeing the two labors of land to defendant.

*Winkler*, for appellants. The view we have taken of the case, is, that the last amended answer of the defendant, is in effect the institution of a cross-action, having for its object the enforcement of the contract between Farley and Sally McKey; and that the case would be governed by similar rules, to those applying in suits for specific performance. If we are correct in this, the appellee ought not to recover on the amended plea, either upon the facts, or the law of the case, because—

1st. This is a stale transaction, of more than twenty-years' standing, and therefore ought not to be enforced; and although the instrument from Sally McKey purports, upon its face, to be an absolute conveyance, yet the production of the note, given by Farley, and the deposition of the witness, McLennan, rebuts this, and shows a sale incomplete, and dependent upon the further action of the parties, to render it valid. According to the civil law, then in force, "the parties do not "intend the contract shall subsist, unless each of them performs "his engagement." (1 Domat's Civ. Law, p. 247, § 13.) It

will hardly be contended that the two instruments, the deed and the note, between the same parties, of even date, do not constitute the transaction.

2d. Sally McKey, the grantor of Farley, had no power to convey any particular part of the estate of Thomas McKey, without the concurrence of the other joint owners of the estate; for, although one of several joint owners could sell his undivided interest, he not only could not sell a particular portion, but he could not make any material change in the common estate, without the concurrence of the other joint owners, either expressed or implied. (1 Domat's Civ. Law, p. 585, § 6.) And, for obvious reasons, each one of the joint owners or tenants in common, was entitled to an equal division; which right would be thwarted entirely, by allowing any one, without the concurrence of the others, to sell a particular portion of the common estate. It seems, however, to have been conceded by the court below, that the pretended conveyance was not sufficient to pass the title to the particular land conveyed, but that it would pass title to an undivided interest of so much of Sally McKey's share of the estate; and that Welch, by virtue thereof, would be entitled to take the place of Sally McKey, in a subsequent partition of the land, *pro tanto*, and become a tenant in common, with the widow and children of Thomas McKey, in the league of land in question. In reference to this view of the subject, we say—1st. That to allow this, would be to allow one of the joint owners to make a material change in the situation of the property: 2d. The deed does not purport to convey an undivided interest: 3d. The amended answer, the *cross-bill* of the defendant, does not pray for an undivided interest, but for a particular portion, any of which is without authority of law, so far as we have been able to find: 4th. If Welch could be subrogated to the rights of Sally McKey, he could not then maintain his action for a particular portion of the common estate, but must sue for partition. (Compton v. Matthews, 3 La. Rep. 136.)

3d. The pleadings are not sufficient to warrant the decree

rendered in the court below. A decree, for an undivided interest, is not asked for; the prayer is, for the particular tract of land; and there is not even a prayer for general relief. The prayer must ask for the relief granted.

4th. The deed to Farley purports to convey lands belonging to the estate of Thomas McKey, without any pretence of authority by will, order of court, or otherwise, so to convey, and carries on its face its own condemnation.

5th. If there be any doubt that Welch had full knowledge of the condition of the title, at the time of his purchase from Farley, that doubt will be removed by the evidence; and if it should appear that Welch, notwithstanding his defective title, has equities which ought to be protected, such as improvements upon the land, we say, the proof shows, and the verdict of the jury finds, that the improvements were made against the will and consent of the appellants. They did not stand still and see their property improved, without letting their rights be known; and they speedily attempted to enforce them by the institution of this suit.

Upon these views, we ask the court to reverse the decree rendered in the court below, and render here a decree in favor of the appellants for the land sued for.

*Barziza* and *Gould* for appellee. The appellee respectfully suggests, that there is no error of which the appellants have any right to complain. The suit was one of trespass to try title; the proof, and the verdict, show that the defendant was joint owner, or tenant in common, with the plaintiffs, of the land sued for; and it is believed to be too well settled to require authority, that in such case the action must fail. That the defendant tendered a balance of the purchase money to the plaintiffs, should certainly be to them a matter of rejoicing, rather than of complaint. The right of defendant, to an undivided interest in the league, to the extent of two labors, is clear; and it is believed that, if any one has a right to complain, it is

the appellee, who might well have claimed his costs in the court
below.

WHEELER, CH. J. It appears to be well settled, and upon good
reasons, that one joint tenant, or tenant in common, cannot
convey a distinct portion of the estate, by metes and bounds, so
as to prejudice his co-tenant; for, to give effect to such aliena-
tions, as against the co-tenants of the grantor, would be to
create new tenancies in common, in distinct tracts or parcels of
the estate, held in common, to the injury of the co-tenants. As
one tenant in common has no right, on partition, to select any
particular portion of the land, and insist on having his part set
off in that specific portion, so he cannot convey such a right to
his grantee. (Bartlet v. Harlow, 12 Mass. Rep. 348, 353, 354;
Porter v. Hill, 9 Id. 34; Blossom v. Brightman, 21 Pick. Rep.
284; Jewett v. Stockton, 3 Yerg. Rep. 492.) "One joint
"tenant, or tenant in common, (says Kent,) cannot convey a
"distinct portion of the estate by metes and bounds, so as to
"prejudice his co-tenants, or their assignees, even though it may
"bind him by way of estoppel. As against the co-tenants, such
"a deed is inoperative and void." (4 Kent's Com. 368.) The
same rule, it seems, obtains in the civil law. (1 Domat's Civ.
Law, part 1, book 2, tit. 5, § 2, art. 6.)

The purport of the deed, under which the defendant claimed,
was to give a right to select and hold, in severalty, a distinct
portion of the common property, by metes and bounds. It was
ineffectual and inoperative, to give such a right, as against the
co-tenants of the grantor. But still, it seems, it would be valid
and effectual to bind the grantor herself, by way of estoppel.
(Bartlet v. Harlow, 12 Mass. Rep. 354; Varnum v. Abbott,
Ibid. 474; Rising v. Stannard, 17 Ibid. 282.) It may have
been in this view, that the court proceeded to decree to the
defendant, a right to select the two labors out of the purpart of
his grantor, after it should be set apart to her. This might
have been correct, if the pleadings had been so framed as to
admit of such a decree; but they were not. The defendant did

McKey v. Welch.

not frame his answer with any such view, or with a view to any equitable relief, to which he may have been entitled, as against his grantor. It, therefore, was not competent to render a decree in his favor, which he had not asked, and for which there was no basis laid in the pleadings. And hence, it does not become necessary to decide, whether such a decree might legally have been rendered, if prayed for specifically, or under a prayer for general relief. Nor is it necessary to inquire, whether the defendant might have called on the court to decree a partition of the estate, in order that his interest might be set apart to him, out of the portion allotted to his grantor; as the defendant has not sought such relief, or asked the aid of the court, to move his grantor to partition the estate between herself and her co-tenants, in order to effectuate his right as against her. The only judgment which could legally be rendered upon the verdict, was a judgment for the plaintiffs, with costs. The judgment must therefore be reversed, and such judgment be here rendered.

Reversed and reformed.

JOHN W. WRIGHT AND ANOTHER V. BENJAMIN WILMOT.

The court cannot supply, by construction or intendment, the want of proper
    certainty in a writ, as to the time when the defendant is cited to appear, &c.
    in order to support a judgment by default. If the writ be defective, it should
    be quashed, and another citation properly served upon the defendant.

ERROR from Dallas.    Tried below before the Hon. Nat. M.
Burford.

The facts are stated in the opinion.

*Good* and *McKenzie*, for plaintiffs in error.

*Nicholson*, for defendant in error.

BELL, J.   The plaintiffs in error were defendants in the
court below.   The writ to defendant, Wright, purports to have
been issued on the 4th of December, 1858.   The writ to
Leonard, was issued on the 4th of January, 1858.   The writs
cite the defendants to appear " on the 16th Monday, after the
4th Monday in September, 1858."   The judgment was rendered,
by default, on the 25th day of January, 1858.

The service is not sufficient to support the judgment.   The
writs were defective, and ought to have been quashed, and other
citations properly served on the defendants.   The courts cannot
supply, by construction or intendment, the want of proper cer-
tainty in a writ, in point of time.   The judgment is reversed,
and the cause remanded.

                                    Reversed and remanded.

## ABRAHAM BAST V. JAMES H. ALFORD.

It is the well established rule of this court, that the charge of the judge below, will not be revised, unless there be a statement of facts in the record; except the pleadings contain matter which shows the charge to be necessarily erroneous.

Where the record does not show, that any objections were made to the admissibility of evidence; or, what evidence was admitted; an assignment of error, in relation to the admissibility of evidence, is entitled to no consideration.

APPEAL from Dallas. Tried below before E. P. Nicholson, Esq., selected by the parties, the presiding judge being disqualified to try the cause.

Suit by appellee, against appellant, for the specific performance of a contract for the sale of land.

*Crockett*, for appellant.

*John J. Good*, for appellee.

BELL, J. This cause has been twice tried in the court below. The judgment of the court below, on a former trial, was reversed by this court, at its last term, because the evidence on a single point was not explicit, and it was possible that the judgment gave the plaintiff below more land than he was entitled to recover, and more than he demanded by his suit. On the last trial of the cause, the jury again found a verdict for the plaintiff below. The appellant has brought up no statement of facts; and the errors assigned, relate only to the charge of the court, and to a ruling of the court upon the admissibility of evidence. The charge of the court appears to be correct; and if it did not so appear, it is the well established rule of this court, that the charge of the judge below, will not be revised, unless there be a statement of facts in the record; except in a case where the pleadings contain matter which shows that the charge is necessarily erroneous.

The record does not show that any objections were made to the admissibility of evidence ; nor does it show what evidence was admitted.    The assignment of error, in relation to the admissibility of evidence, is, therefore, not entitled to any consideration.    We have no reason to doubt that the justice of the case has been attained, and the judgment is therefore affirmed.

Judgment affirmed.

## JAMES DRAPER v. THE STATE.

Where A and B (who were soldiers) were shown to have started from camp, about ten or eleven o'clock in the morning, in company with C, to guide him into a trail, by which he could save some eight miles of travel upon the main road; and were seen with C about three quarters of a mile from the fort, going in the direction of the trail, and about the same distance from where the remains of C were afterwards found, and where he was apparently murdered; and it was also shown, that A and B returned to camp about three o'clock of that day, and that C had not been heard of subsequently; and that A, when he heard that he was charged with the murder of C, left camp without permission, going in the direction that B had that morning gone, and met, and had a long private conversation with B, and then returned to camp with him; and that A, when asked, denied having gone with C, when he left the fort, but when shown the shirt and skull found at the place of the murder, was much excited, and after a few minutes, said, "I did not go over the hill with C ; I know nothing about it:" *Held*, by the court, that there were no such circumstances of a common design between A and B, as would authorize the admissibility of A's declarations, as those of a co-conspirator.

The general rule of law is well settled, that a man's confessions of guilt, can only be used against himself.

If improper testimony, which may have influenced the jury, have been received, the court cannot look to the whole case, to determine whether or not there be other testimony sufficient to establish the defendant's guilt.

The defendant is entitled to the verdict of a jury, upon competent testimony alone.

APPEAL from Bexar.    Tried below before the Hon. Thomas J. Devine.

The appellant and James Beardall were indicted, on the 16th of September, 1858, for the murder of Louis Vare. The indictment charged the immediate killing to have been the act of Beardall; and that appellant was present, aiding, assisting, &c. The defendants were permitted to plead, and to be tried separately; and appellant being placed on trial, the jury found him guilty, and assessed his punishment at imprisonment in the penitentiary, at hard labor, for life.

The testimony upon the trial showed, that Beardall and the appellant left Fort Lancaster, between nine and eleven o'clock on the morning of the 4th of February, 1858, with Louis Vare; that they (Beardall and the appellant,) returned about three o'clock in the evening; and that Vare had not been seen or heard of since that day. Beardall and appellant were escorting Vare to a trail, which led into the main road from Fort Lancaster to San Antonio, that could be traveled on foot or on horseback, and by which a person could save about eight miles of travel. Vare was on horseback, and wished to go this trail way, to overtake a train with which he had intended to travel, but which had left the fort some hour or two before him. Beardall and appellant, when they left the fort, were upon foot, and armed with rifles. After they left the fort, Beardall, appellant, and Vare, were seen by one witness, who said, that he was herding horses, some three fourths of a mile from the fort, and about ten o'clock in the morning they passed him; they were "on the trail leading to the cut off. He left them right where "the trail takes up over the hill; he was two or three hundred "yards from them, when they stopped, as if to take a drink; "they went on, and witness went back to camp."

On the 21st of July, 1858, the witness, Reagan, having informed the commanding officer, that Beardall had confessed he had murdered Vare, a search was made, and about a mile and a half from the fort, on the direct road of the cut off, at the place indicated by Reagan, the remains of a human body were found; which, from the formation of the under jaw and lower teeth, were identified by the witnesses, as the

remains of Vare.  Near the remains was found a gray shirt, or coat, (such as was worn by Vare, the day he left the fort,) stained with blood, with a bullet hole through the back.  In the breast pocket, was found a letter, also stained with blood, addressed to Vare.  The other pockets were turned wrong-side out; and pipes, tobacco, &c., were found emptied upon the ground, a short distance off.  The remains of a horse were found, shot in the skull, and thrown over a bluff; near by, were also found a saddle, blanket coat, cup, and other equipments, belonging to a horseman.  All the articles found, were taken to the commander of the fort; and he sent for appellant, who denied having accompanied Vare, on the day he left the fort.  Appellant was then shown the skull and shirt, and asked, if he did not accompany the man, who wore that shirt, and whose skull that was, up the hill, on the day that he (Vare) left camp.  He was so excited that he could not speak, but after a few minutes said: "I did not go over the hill with Vare; I know nothing about it."  The top of the hill was about three fourths of a mile from the fort, near where they had been seen by the witness, who was herding horses; and who said, upon cross-examination by appellant, that when he last saw them, they were pointing in the direction of the path over the hill.

On the day that Reagan made it known, that Beardall confessed to him, he had killed Vare, he (Beardall) was upon the sick list; and after it was generally known in the camp, without the knowledge or permission of the officer of the day, he left the camp, and went in the direction that appellant had that morning gone, (to the Pecos Springs, some eleven miles distant,) with others, to gather plums, and met him about two miles and a half from the camp.  Appellant and one of the witnesses were waiting for the wagon to come up.  When Beardall met them, he got his horse from the witness, and asked appellant to go in the bottom with him and kill deer.  Witness got in the wagon and they started for the bottom, but returned back on to the road in about ten minutes, and followed after the wagon, at a slow pace.  After they got to camp that evening, they

were arrested. The deceased, Vare, had been the beef contractor at the fort; but, as was generally known, had sold his contract, the day before he left the fort, for $2,250.

Reagan was then permitted by the court, overruling the objection of appellant, to testify that, on the day after appellant and Beardall left the camp with Vare, Beardall came to witness, who was confined in the guard-house, and borrowed his hunting boots; "when he (Beardall) returned the boots, he "called me out and said, that he had shot old Louis. He shot "him in the back; didn't kill him; he then called on Draper "to shoot. Draper said he would not; he then pulled Draper's "rifle, and shot him in the neck, which killed him. He then "searched his pockets, and found only about $20; that Draper "had acted a damned cowardly part in the transaction; that he "scalped old Louis, as well as he could; that he then shot his "horse, and threw it over the bluff; hid the body of Vare in "the ravine. He said, that the reason he killed Vare, was "because he thought he had a *pile* with him, but he only had "about $23; that he borrowed my boots to go and drive cattle "up and down the ravine, to make folks think that Indians had "been there. Beardall described to me, the place where Vare "was killed; I had never been there." On cross-examination, he said, "I gave the information in July; I had no particular "reason for not telling before, but that I was in the guard- "house, at the time, and wanted to keep it secret."

There was much other testimony, detailing minutely the search that was made for the body of Vare; the circumstances to identify it; also, inquiries that had previously been made for Vare, by his friends. By appellant's testimony, it was shown, that Beardall and the witness, Reagan, had had a difficulty, a short time before the latter made public Beardall's confession. In rebuttal, it was also proven, that Reagan was a man of good character for truth and veracity.

*Wilcox* and *Leigh*, for appellant.

*Attorney-General*, for appellee.

BELL, J. We are of opinion, that the court below erred, in permitting the declarations of Beardall to go to the jury, as evidence against the defendant, Draper. Apart from the declarations of Beardall, the testimony would have been wholly circumstantial. Beardall's declaration made it certain, that Vare had come to his death, on the day when he was accompanied from Fort Lancaster, by Beardall and Draper. But for Beardall's declaration, the jury might not have been satisfied of the main fact to be ascertained, viz., that Vare was killed by Beardall, at a time when Draper was present. The declaration of Beardall, therefore, settled a most important fact to be found by the jury. The declaration was mere hearsay, so far as the defendant, Draper, was concerned. There was no such certain proof of a common design between Beardall and Draper, as would authorize the admissibility of Beardall's declarations, as those of a co-conspirator. The court instructed the jury that, before they could find Draper guilty, they must be satisfied, first, that Louis Vare was killed, as charged in the indictment; and secondly, that Beardall killed him, as charged. Now it is impossible to say, that the jury were not satisfied of these facts, mainly from the declarations of Beardall. The general rule of law is well settled, that a man's confessions of guilt, can only be used against himself.

Mr. Phillips, in his work on Evidence, vol. 1, p. 414, says, that where a prisoner makes a confession implicating other persons, "the judge will not fail to caution the jury, that the confession ought not to affect any one but the person who made it."

In the present case, Draper was tried separately from Beardall; Beardall's confessions were hearsay, as against Draper; and it is impossible to say, that the verdict of the jury was not influenced by this improper testimony. In such cases, we cannot look to the whole case, to determine whether or not there is other testimony sufficient to establish the defendant's guilt. To do so, would be, in effect, to set aside the verdict of the jury, and to form conclusions for ourselves from the evidence. The

defendant is entitled to the verdict of a jury, upon competent testimony alone. The judgment of the court below is therefore reversed, and the cause remanded for another trial.

Reversed and remanded.