13    65
28    518

[No. 1239.]

### Neeley Morris *v.* The State.

1. Indictment—Practice in this Court.—It is only when an indictment is fatally defective as to matter of substance, that it can be primarily assailed in this court.
2. Same.—To authorize a review by this court when the objection goes to mere matter of form in the indictment, it must appear that the party endeavored to have the indictment corrected in the court below, at the proper time.
3. Same—Robbery.—Article 722 of the Penal Code provides that "if any person, by assault, or by violence and putting in fear of life or bodily injury, shall fraudulently take from the person or possession of another any property, with intent to appropriate the same to his own use, he shall be punished by confinement in the penitentiary not less than two nor more than ten years."
4. Same—Intent.—Article 506 of the Penal Code provides that "an assault with intent to commit any other offense is constituted by the existence of the facts which bring the offense within the definition of an assault, coupled with an intention to commit such other offense, as of maiming, murder, rape or robbery."
5. Same—Pleading.—Where a particular intent is a material fact in the description of the offense, it must be stated in the indictment.
6. Same—Robbery.—An essential element in the offense of robbery is that the property was taken with the intent on the part of the taker to appropriate it to his own use, and such an allegation is indispensable to the sufficiency of an indictment for robbery.

E

7. SAME—ASSAULT WITH INTENT TO ROB.—An indictment for assault with intent to rob, if it alleges that the intent was to rob, is sufficient to charge the offense, without specifically alleging that it was the intent of the accused to appropriate the property of the injured party to his own use.

8. SAME—STATUTE CONSTRUED.—The proper construction of Article 506 of the Penal Code is that in charging an assault with intent to commit some other offense, it is only necessary to allege such matters as bring the offense within the definition of an assault, coupled with an intention to commit such other offense, naming it, without giving the constituent elements of the offense intended to be committed.

9. PLEADING.—It is a rule of pleading that in charging an assault with intent to commit some other offense, the same particularity is not required as is required in charging the offense itself.

10. EVIDENCE—ACCOMPLICE TESTIMONY.—It was error to admit, over the objection of the defendant, the declarations of his co-defendant against him, made after the consummation of the conspiracy, and in the absence of the defendant.

APPEAL from the District Court of McLennan. Tried below before the Hon. B. W. Rimes.

The indictment charged the appellant and one William Self with an assault with intent to rob Sanford Allen, in McLennan county, Texas, on the sixteenth day of March, 1882. Upon the application of his co-defendant, a severance was granted, and the appellant was placed first upon trial. He was convicted, and awarded a two years term in the penitentiary.

Sanford Allen, the party alleged to have been assaulted, was the first witness introduced by the State. He testified that, on the night of the sixteenth of March, 1882, he met William Self, the party jointly indicted with this defendant, on the public square, in Waco, McLennan county, Texas. Self proposed that they should go to a saloon on Austin street and take a drink, to which, after demurring for a time, the witness consented. From the Austin street saloon they went to the square, and sat down on the sidewalk at Cameron's. While there Self asked after a bill of sale to a horse which had passed between the two, and the witness, taking out his money purse to exhibit the bill of sale, exposed to Self some money, amounting to two hundred and thirty dollars, which the witness had in the purse. Self remarked: "I see you have some money yet." The witness replied: "Yes, I have a little; about enough to live on." Self said: "Times are hard," and after some further talk, asked: "Don't you want to knock around awhile to-night?" The witness agreed, and they presently separated, Self going

towards East Waco, where he boarded with a party named Phillips. Their understanding was that they should meet after getting supper, and "knock around" town awhile.

After getting his supper, the witness went about forty yards, to a bridge on North Second street, and there found the man Self, and also the defendant and a man named Frazier. The defendant did not speak, and the witness asked Self if he was "miffed." When the witness reached the bridge, the defendant and Frazier walked off together towards town. The witness asked Self if the man with defendant was not Frazier. He replied that it was not Frazier, but a man named Johns, or Johnson. The witness, however, knew that it was Frazier, and he distinctly recognized the defendant. Upon Self's solicitation, the witness then accompanied Self to Cora McMahan's dance-house on the "Hill," where Self said he expected to find a man named Brooks, whom he desired to see. They saw several parties at this house of ill-fame. After remaining there for some. time, Self declared that he was satisfied, and proposed to return to town. The witness acquiesced, but proposed that they should get some one of the men present to return with them. To this Self objected, saying that Cora McMahan would be angry and accuse them of enticing away her custom.

The two, Self and witness, left the dance-house together, on their return to town, and had gone about one hundred and fifty yards, to a point near a bridge over a "branch" or ravine. Here the defendant stepped into the road, with a pistol in his hands, and ordered the witness to throw up his hands and surrender. He said he was going to search the witness. He ran his hands along down the side of witness's person, and attempted to put his hand in the pocket in which witness had his money. At this, the witness struggled, and the defendant struck him over the head twice with the pistol. The witness caught at the pistol, and, as he did so, the defendant threw the pistol down on him and snapped it. The hammer caught on the witness' shirt, and it did not explode. The witness succeeded in wrenching the pistol from the defendant, and ran with it. When he had run a distance of perhaps fifteen or twenty steps, the witness heard the defendant and Self talking in a low tone of voice, or what, in the witness's half-stunned condition, sounded to him like a low tone. The defendant ran off towards the river, and Self hallooed to the witness: "Sam, I am loose from them, too." He then came up to where the witness was.

The man Self was with the witness when the defendant stepped into the road with the drawn pistol, and was on the side next to the defendant. The latter passed around Self and assaulted the witness in the manner described. Self looked on and said nothing until the defendant threw his pistol down on the witness, when he said "don't shoot him." When Self overtook the witness after leaving the defendant, he went with him to town, and en route asked to see the pistol which the witness had wrenched away from the defendant. He examined it, and said that it looked like a pistol he had once owned, and advised the witness to say nothing about the affair. The witness declined to suppress information, and told Self that he was going to lodge complaint with the officers. Witness and Self went on together until they crossed the bridge on North Second street, when Self again requested the witness to say nothing about the attempted robbery, and asked him to secrete the pistol, assuring him that if he carried it into town he would be arrested. The witness declined, and Self offered him ten dollars for the pistol. The witness refused this offer, and hunted up L. Y. Stayton, a policeman, to whom he reported the affair. The witness, Stayton and Self returned to the place where the assault was committed, and there found the witness's hat, which he had lost in the scuffle. When they started, Self at first lagged behind, and then asked, "Do you want me to go with you?" to which the witness replied: "You might suppose I do." Self remained that night with the witness, and again, before going to bed, proposed to purchase the pistol. The witness replied that he had no authority to sell it. No more was seen of the defendant that night.

The next morning Self got out of bed early and went to his boarding house in East Waco and got his breakfast. He returned immediately, and made another effort to prevail upon the witness to sell him the pistol. After breakfast, the witness took the pistol to the court house, and delivered it to Van Hall, the sheriff. The pistol was here offered in evidence, and was identified by the witness. The witness did not at first tell Van Hall who the parties were that attempted to rob him, because he was afraid of them. He afterwards told, and made affidavits against them. He told Stayton, the policeman, that he did not know who the parties were, though as a matter of fact he did know, but was afraid he could not prove it. He first divulged the names to Sheriff Hall. He knew the defendant well, and

noticed that he had something over his mouth when he made the attempt at robbery. The witness ate an early supper that night. He met Self, and saw the defendant and Frazier at the bridge on North Second street at an early hour, and the attempt to rob him occurred at an early hour—probably not later than eight o'clock. It was the recollection of the witness that it was a moonlight night, but that the moon was obscured by a cloud.

The witness had previously known Self in Sherman, Texas, and the two had often slept and eaten together. He had met the defendant but a few times, and had never had business transactions with him.

Judge J. T. Davis, referring to an almanac, testified that there was no moon on the night of the alleged attempted robbery, but that the night was necessarily dark.

L. Y. Stayton testified, for the State, that he was an officer on the Waco police force. On the night of the sixteenth of March, 1882, at about eight o'clock, he met the defendant and another man, who was not Self, on the suspension bridge over the Brazos river. They were going from the west side towards East Waco. From there the witness went to Austin street, and in about an hour and a half later, he heard a police whistle blow. Immediately thereafter, the witness Allen and Self came to him and reported that some one had attempted to rob Allen. The witness went to the alleged scene of the attempted robbery, but could find no one. Allen said that the man who made the assault upon him had a cloth or handkerchief over his face, and that he did not know and could not identify him.

Van Hall, sheriff of McLennan county, testified that the alleged attempted robbery was reported to him on the morning after the occurrence. A pistol was delivered to him which was said to have been taken from the man who made the assault. The witness took the pistol to the man Self, in East Waco, and asked him if he knew whose pistol it was. After examining it, Self said that it looked like a pistol which he had once owned, but which, several days before, he had sold to the defendant. He also stated that the defendant had sold it to a stranger from Corsicana. The witness returned to the office in West Waco, with the defendant and Self, where they both remained until Allen swore out complaints against them, and they made no effort to evade arrest. The defendant told the witness that he sold the pistol produced in court to a stranger from Corsicana for a coat and five dollars. The pistol, belt and cartridges in

court were the identical ones delivered to him by the witness Allen. Three of the cartridges had small indentations upon the caps, as if the hammer of the pistol had fallen upon them. Allen did not at first say who the parties were that attempted to rob him. He said that he thought he knew, but was afraid that he could not prove it. He afterwards named the defendant and Self, and swore out complaints against them.

The defense reserved exceptions to all of the statements made by Self subsequent to the assault.

J. F. Ellison testified that several weeks before the attempted robbery he had worn the pistol produced in court. The witness was a constable, and the man Self had attempted to sell him the pistol. He returned it to Self without purchasing.

A. J. Buchanan testified that he was a policeman, and resided in East Waco. On the night of March 16, 1882, at about eight o'clock, he heard a police whistle, and crossed the river into West Waco. Near the State Bank he met Recorder Brinkerhoff and Marshal Luke Moore, who told him that an attempt to rob the witness Allen had been reported, but that the police had gone to investigate the matter and the witness need not give it further attention. The witness returned to his home in East Waco, next to the boarding house of Phillips, where the defendant lodged, about nine o'clock, and saw the defendant walking up and down the pavement in front of Phillips's in his shirt-sleeves, smoking a cigar. The defendant proposed to the witness to go with him and get a cigar. He went with him for that purpose to a saloon about sixty yards distant, and returned at about ten minutes after nine o'clock. The witness saw no more of the defendant that night.

The substance of the testimony of Mrs. Phillips and Miss Carrie Phillips, for the defense, was the same. It was to the effect that they carried on a boarding house in East Waco. They had supper at about six o'clock on the evening in question. The defendant and Self ate together at the first table. They saw no more of Self that night after supper. The defendant remained around the house after supper, and was seen in his shirt-sleeves walking about and smoking a cigar. The witnesses finished cleaning up and washing the dishes at about seven o'clock, when Miss Carrie Phillips took a seat at the parlor window to write a letter. The defendant came to the window several times and spoke to her while she was writing. After Miss Carrie had finished her letter, the defendant came to the window and the two

remained in conversation for some time. The defendant was not missed from the place after supper for any considerable time, but was seen there in conversation with other boarders. The witnesses retired at about half-past nine o'clock. They and the defendant went first to the water bucket, and separated, going to their rooms. The rooms were separated from each other by plank partitions, and the witnesses distinctly heard the defendant talking to other boarders in his room, after he retired. After supper the witnesses saw the defendant's coat and hat in the dining room, where they remained all night.

L. J. Phillips, husband and father of the last witnesses, corroborated their statements, and testified further that the down train on the Houston and Texas Central railroad, arrived that night, as usual, about eight o'clock. The defendant and Mr. Chapman went to the train in East Waco, together, remained some time, and returned to the boarding house together. Mr. Chapman corroborated this statement.

*Makeig & Johnson*, and *C. B. Pearre*, for the appellant, filed an able brief.

*H. Chilton*, Assistant Attorney General, for the State.

WHITE, P. J. In the lower court no attack was made upon the indictment, either by motion to quash or by motion in arrest of judgment, but its sufficiency to sustain the conviction is now, for the first time, called in question on this appeal.

We think that the proper rule is that where the indictment is fatally defective in matter of substance, a party may avail himself of the defect for the first time on appeal, but not so with regard to matter of form merely. The reason for the rule is found in the constitutional provision, which requires that the accused in all criminal cases shall have the right to demand the nature and cause of the accusation against him. (Bill of Rights, sec. 10; *Cox et al.* v. *The State*, 8 Texas Ct. App., 254.)

With regard to matters of form (because the statute provides that they may be amended), in order to entitle a party to avail himself of them, he must show that he has endeavored to have them properly corrected in the court below. Besides, a defect of substance in an indictment is a fundamental error which may be availed of at any time.

In the case before us, which was an assault with intent to rob,

it is earnestly and ably insisted that the indictment is fatally defective in that it fails to allege that the acts complained of were done with intent to appropriate the property intended to be acquired by the felonious assault to his, the assailant's or defendant's, own use.

We have been cited to numerous authorities, both of our own and of other courts, which by analogy, it is contended, support the position; but no case has been furnished us directly covering the point involved. The position assumed is that, in an indictment for an assault with intent to rob, it is not only necessary to allege the assault and the intent with which it was committed, but to so particularize the offense intended to be committed as that all the elements and ingredients of robbery should also be charged, as the same are defined by statute, Article 722, Penal Code, as follows: "If any person, by assault, or by violence and putting in fear of life or bodily injury, shall fraudulently take from the person or possession of another any property, with intent to appropriate the same to his own use, he shall be punished by confinement in the penitentiary not less than two nor more than ten years."

It is also provided by statute that "an assault with intent to commit any other offense is constituted by the existence of the facts which bring the offense within the definition of an assault, coupled with an intention to commit such other offense, as of maiming, murder, rape, or robbery." (Penal Code, Art. 506.)

And we have the further express provision contained in our Code of Criminal Procedure, that, "where a particular intent is a material fact in the description of the offense, it must be stated in the indictment." (Code Crim. Proc., Art. 423.)

It is to be noted that in the definition of robbery, as we have quoted it above from our Penal Code, one of the elements, and one of the most important elements of the offense, is the intent with which the acts constituting the assault were committed, which, as stated in the language of the statute, is "with the intent to appropriate the same," to-wit, the property attempted to be fraudulently taken, "to his own use." Without the intent to appropriate the same to his own use, that the offense of robbery is not complete under the statute is clearly evident. In an indictment for robbery such an allegation would be indispensable to the indictment. But here the party is not charged with robbery, but with an assault with intent to rob, and the intent, so far

as concerns the offense with which he is sought to be charged, is fully stated, to-wit, to rob.

We hold that the proper construction of Article 506 of the Penal Code, above quoted, is that it is only necessary, in charging an assault with intent to commit some other offense, to allege such matters as bring the offense within the definition of an assault, coupled with an intention to commit such other offense, naming it, without giving the constituent elements of the offense intended to be committed; and this, we think, is the clear import of the previous decisions of our courts upon the question. Wherever the offense is by the Code defined, as is the case in maiming, murder, rape, robbery, etc., in charging assaults with intent to commit those offenses, it is only necessary to charge the assault and the offense intended to be committed *eo nomine.* (*Martin* v. *The State,* 40 Texas, 19; *Bittick* v. *The State,* 40 Texas, 117; *Long* v. *The State,* 10 Texas Ct. App., 186; *The State* v. *Croft,* 15 Texas, 575; *Shinn* v. *The State,* 68 Ind., 423; Wharton's Precedents, 4 ed., pp. 251–54; *Buntin* v. *The State,* 68 Ind., 39.)

Another rule of pleading is, that in charging an assault with intent to commit some other offense, the same particularity is not required as is required in charging the offense itself. (*Dickenson* v. *The State,* 70 Ind., 247.)

On the trial of the case, exception was reserved by the defendant to the ruling of the court, over objection of defendant, in admitting against this defendant the declarations of the co-defendant, or co-conspirator, Self, made after the consummation of the conspiracy and in the absence of this defendant. These objections, we think, were well taken, and the court erred in the admission of the evidence. (*Draper* v. *The State,* 22 Texas, 400; *Myers* v. *The State,* 8 Texas Ct. App., 321; *Hightower* v. *The State,* 22 Texas, 605; *Wright* v. *The State,* 43 Texas, 170; *Simms* v. *The State,* 10 Texas Ct. App., 131.)

The judgment is reversed and the cause remanded.

*Reversed and remanded.*

Opinion delivered October 21, 1882.