## W. W. SIMMS *v.* THE STATE.

1. JOINDER OF OFFENSES—DUTY OF STATE TO ELECT BETWEEN COUNTS. When an indictment contains more counts than one, and they charge distinct felonies, it is the right of the defendant, as soon as the prosecution has developed its proof, to require the State to elect on which count a conviction will be sought. · The election should, as a general rule, be made before the defendant enters upon his evidence.

2. SAME—PRINCIPALS AND ACCOMPLICES.—The first count of an indictment for the murder of one S. charged the defendant as a principal offender, and the second charged that one P. was the princial offender and the defendant an accomplice. When the state closed its evidence in chief, the defense moved that the prosecution be required to elect between the counts. In view of the rule that a party indicted as a principal cannot be convicted as an accomplice, and *vice versa*, as well as on account of differences in the rules of evidence applicable to such diverse prosecutions, it is *held* that the motion should have been sustained.

3. SAME—MURDER.—The state was allowed, over objection, to prove certain acts and declarations of said P., done and made subsequent to the homicide, and when the defendant was not present; and the defendant was found guilty of murder in the first degree " as prin-

cipal." *Held,* that, as such acts and declarations of P. were not competent evidence under the count which charged the defendant as a principal offender, their admission may have been prejudicial to him, and therefore was material error.

4. CIRCUMSTANTIAL EVIDENCE.— In cases wholly dependent on circumstantial evidence no definite line of demarcation between proximate and remote facts can be drawn, and the criterion of their competency is merely whether they tend to cast any light, however feeble, upon the subject of the inquiry. See the facts and the opinion in this case in illustration of the latitude allowable in such cases.

5. EVIDENCE OF DECEASED WITNESS.— Whatever the former rule may have been, it is now settled that, to reproduce the testimony given at a former trial by a witness who has since died, the person called to prove it may state its substance, if unable to repeat its precise language.

6. CONFESSION OF A CONFEDERATE.— In the trial of a defendant on an indictment which charges him as an accomplice, it is competent for the state to prove confessions of the principal offender, for the sole purpose of establishing the latter's guilt; but the jury should be instructed that the confession is not evidence against the defendant for any other purpose.

APPEAL from the District Court of Limestone. Tried below before the Hon. D. M. PRENDERGAST.

This is the second appeal of W. W. (commonly called Bunk) Simms from a conviction for murder in the first degree. The case upon the former appeal is reported at page 230, 8 Texas Ct. App. Reports, and a summary of the evidence was there given. The rulings in the present appeal require a more full and specific detail of the testimony.

William Simms, a brother of the appellant, was a single man who lived on his stock farm in Limestone county. While sitting at his supper table, May 31, 1878, he was assassinated by fire-arms. At the ensuing September term of the District Court of Limestone county, the grand jury returned separate indictments against the present appellant and one C. L. Avery. That against the appellant contained two counts, by the first of which he

was charged as a principal offender in the murder of William Simms, whereas in the second it was charged that one J. T. Plummer was the principal and the appellant an accomplice. The second trial of the appellant in the court below was had in July, 1880, and resulted in a verdict which convicted him "of murder in the first degree as principal," and assessed his punishment at a life-term in the penitentiary. A new trial was refused, and he appealed.

At the trial in the court below, the first witness examined by the State was Pete Williams, a negro, who said that at the time of the killing he was a tenant of the defendant. One night about a month before the homicide, on his way to the house of the defendant, to get some instructions about his work, he overheard some conversation, before he reached the house and near the defendant's fence, between defendant and one J. T. Plummer. These parties he first recognized by their voices. The defendant said to Plummer: "I want to get you to do that work for me;" but did not say what the work was. Plummer answered: "When I tell a man I will do a thing for him, he may depend on it." The defendant then said: "Bill won't leave, I can't leave, and we both can't live in the same county." The defendant told Plummer that he would pay him well to have the work done, and would prefer having some one else do it, but if he could not get others to do it, he would do it himself. The witness remembers nothing else that was said on this occasion. The night was very dark. As soon as the witness had heard this much pass between the parties he walked up to them, and Plummer said: "Hello, Pete, are you right from home?" Witness answered, "yes," and Plummer asked, "did you hear what I said?" Witness replied, "no; but I heard you talking of a mighty big day's work." This talk occurred at a board-pile, near and outside the fence around defendant's house.

On the day of the killing, in the evening, when the sun was about an hour and a half high, the defendant came to a field in which the witness, Plummer and C. L. Avery were at work. He first approached the witness and talked about some mules that witness had let get away and which he had that day been hunting. He appeared somewhat angry with the witness because of the mules straying, and said that he had looked for them at every place but one and would then go there. Witness said, "hell, it is nearly night now!" He then left the witness and went to Plummer and Avery, and the three joined in a conversation. Presently Plummer and Avery un-hitched their teams, and the three went off together to-wards the house, passing through the corn and out of sight of witness. The witness saw nothing more of any of them until after he heard the report of a gun that night.

After the witness had eaten supper and while he was standing on his gallery he heard the report of a gun, and, thinking that the defendant was slaughtering a beef, he started to his house to assist in skinning and dressing it, in order to get a part of the meat. It had been the prac-tice of defendant to kill beeves at night, and on such oc-casions he would send for witness to assist in dressing the meat. It was about a quarter of a mile from the house of witness to defendant's house, and thence about a mile to the house of the deceased. When the witness had passed the lane near Plummer's house, and reached the mouth of it, he heard voices approaching him from the direction of Summers' pasture, and, looking, discovered that the parties were Plummer and Avery, both walking, but the former leading the " Jack Sims " roan mare. The witness then turned and walked on ahead of these two and crossed the fence near Plummer's house. The two came up near witness and turned the mare in his lot and they went up towards the house. The witness could not

hear what was said when he first discovered the parties, but when the two got near the yard gate, Avery said to Plummer: "We've done a good night's work to-night," and Plummer responded "yes." Avery then said "I will go up to old Pete's, and see where he is — he is always prowling around. I will see his wife about my clothes." When the witness heard this he "whipped" around and ran on to his house ahead of Avery, and went into his house. Avery came up to the house whistling, and witness went to the door buttoning his pants as though he had just got out of bed. He invited Avery into the house, but the latter declined, saying: "No, I have done a big day's work and am tired; I want to go home and lie down. I came up to see your wife about my clothes." He then asked witness' wife about his clothes, but did not say where they were.

Some time in the fall or winter before the killing, the witness was assisting Avery and defendant kill a hog. While there at that work he heard Avery say to defendant, "that fellow came to my house last night and cursed and abused me for everything he could think of." The defendant asked: "What fellow?" and Avery replied, "Bill," and asked, "what would you do about it?" The defendant replied, "the night has no eyes." The witness did not know the state of feeling existing between the defendant and deceased further than that they were "at outs." Plummer, Avery and defendant were on good terms and were together often, and Avery was in Plummer's employ. The witness told J. C. Sims, John Sims, T. J. Kennedy and Wash Pollock what he knew of the killing, on the Wednesday night following the Friday night of its occurrence. On that night J. C. Sims took the witness from his, witness', house, and told him he wanted witness to tell what he knew of the killing. The witness replied to him "it is mighty bad," and then informed him as he has deposed here.

On cross-examination, the witness said that the night

on which he heard the conversation between defendant and Plummer at the board-pile, it was very dark, but the witness was very near them. He did not go up to them at first because he wanted to see if they were talking about him. He heard Plummer agree to do whatever it was that defendant wanted him to do. The witness had always been well treated at defendant's house, and had been in the habit of going there often. In going, he had to pass by Plummer's house. The report of the gun spoken of appeared to witness to come from defendant's house, and he thought a beef was being killed. Witness thinks that a straight line drawn from his house to deceased's would pass by defendant's. Witness admitted that at the coroner's inquest he denied knowing anything about the killing, and that he made the same denial before the citizens' meeting which was called to investigate the matter. The witness denied that he saw W. J. Reeves at that meeting, but admitted having seen him at Yerbey's blacksmith shop on Wednesday following the killing, but denied that said Reeves said to him in substance that he and other citizens believed that he, witness, had something to do with the killing, and that it was done with his, witness', gun, and promised the witness protection if he would " come out and tell all he knew."

This witness further testified on cross-examination, that on the Wednesday after the killing, and after witness had returned from Yerbey's blacksmith shop, the defendant came to him and told him that he was "playing off" in his work, and had been beating his (witness') wife, and that he wanted witness to leave. This the witness declined to do, unless the defendant would pay him for his crop; which he said he would do. Defendant was mad but did not curse the witness. Witness was also angry. It was on the night following this day that witness told J. C. and John Sims, Kennedy and Pollock what he has here deposed.

On re-examination by the State, this witness testified

that the reason he did not tell what he knew at first was that he was afraid. He was a stranger to people in the neighborhood. He was not called upon to testify in court until the defendant was arrested.

B. M. Burrow was introduced by the State to prove the testimony of the witness Pollock, deceased, on a former trial of this case. He testified that he was present, heard Pollock testify, and took notes of his evidence. The substance of it was that Pollock lived within a mile of the deceased, west. On the morning of the day of the killing he went to Groesbeck to witness the execution of a black man, and had promised to call by on his return and give the deceased an account of the execution. When he had arrived within about a mile of deceased's house, he heard a loud report of a gun, which he was satisfied proceeded from the deceased's house, and he knew that he had no gun. He saw no one until he got to the house. He saw the "Bunk" Sims roan mare, with a man on her back, going west, along a trail that led by his (Pollock's) house. He saw the deceased lying dead about four feet from the door, his body bloody from his hips up. Pollock testified that from the house of deceased he went by Pelton's and Deaver's and told them of the death of deceased, and thence to Summers', where he found Burns and told them. Burns told him to go to Gregory's and notify him. On his way to Gregory's he met "Bunk" Sims (defendant) about four hundred yards from Summers' house, and about a mile and a half or three quarters from deceased's, traveling a cross-road that ran by his (Pollock's) house. The defendant could have gone to deceased's this way. Pollock, according to his testimony, saw defendant again that night about eleven o'clock, coming from the direction of deceased's, riding a black horse. His wife asked him if "Billie" was dead, and he replied to her "they say he is," and then asked for coffee, saying he had had no supper. Two men came with defend-

ant. The defendant called to witness (Pollock) but he did not answer. He saw defendant again next day at Mrs. Summers'. He, defendant, did not go to deceased's house next day nor to the funeral, nor did Pollock know that he was there at all after the killing. He told John Sims first about seeing the mare leave deceased's, and, after pointing out the mare to said Sims, saw him measure the mare's feet, and some tracks near deceased's house, and they were alike.

This witness on cross-examination testified that Pollock stated in his evidence on the former trial that he was traveling a cow-trail, south, that led into the big road about a quarter of a mile from deceased's house, when he heard the gun fired. He was within forty-five or fifty feet of the roan mare when she left the house, but could not recognize the man riding her, nor tell whether or not she had on a bridle and saddle. He got down, went in and stayed long enough to see that the man was dead, and then rode to tell the neighbors as fast as his horse could go. About one hundred yards from where he met the defendant the roads forked, and he could not say which one the defendant had been traveling. One of the forks led to Navasota, the other to Groesbeck. In going to Gregory's from Summers' the traveler has to go in a direction opposite from deceased's.

A. G. Camp, for the State, was also introduced to prove what Pollock had sworn to.

J. T. Plummer, for the State, testified that he had known the deceased in his life-time, and had known defendant and Avery for six or eight years. The latter lived at times with defendant and at others with Ed. Summers. The witness did not know when the deceased and defendant first "fell out," but knows that they did not "get along" together. They first disagreed about some hogs, and the hard feelings engendered continued up to the time of the killing. A plan to kill the deceased

had been matured. The defendant proposed to the witness, time and again, to go with him and kill the deceased. These propositions were first made one or two months before the killing, and were repeated every few days, sometimes in the field and often at the house. The witness tried to beg out of it. One of the places where the plans were talked over, was at the board-pile near the defendant's yard fence. Witness, Avery and defendant were present, the witness and defendant standing up and Avery crouched down by the pile. In this conversation the defendant said that the deceased had injured him — killed his stock — that deceased would not, he could not leave, and both could not live in the same county. The defendant said that he would pay well for the killing; would give the witness $200 to do it; that if he could not get it done he would do it himself. He said further, that Avery had agreed to help him, and Avery said "yes;" that he would assist in any way he could. If any one came up while the party were at the board-pile witness did not see them. He did not see the witness Pete Williams that night.

Late on the evening of the killing the defendant came to the field where the witness and Avery were at work. He spoke to Avery first, and then approached the witness and asked him if he was ready to go with him. He then went to see Pete Williams about some mules that were lost, or a horse with a sore neck, or something of the kind. The defendant then returned to witness and asked him what he was going to do, saying, "We've told you now, and you've got to go with us." The three then went out of the field, through the back part, to where the defendant had his black horse and roan mare hitched. From there they went to an old house containing some corn or shucks, and defendant got a shot-gun. From there the party, defendant, Avery and witness, went to the house of the deceased, the defendant carrying the gun. They rode up in front of the house, and defendant

fired the gun. The deceased jumped up, swung around to the door and exclaimed "Oh! Bunk" three times, and fell out on the ground. Avery then jumped over into the yard and fired a six-shooter twice. The deceased did not halloo after the pistol shots were fired. The witness was sitting on his horse some ten feet behind defendant and Avery, and could not see into the house. Defendant was on the ground with the bridle reins over his arm when he fired. Avery was on the ground when he fired, but witness did not know what he did with his horse in the meantime. After the shots were fired defendant and Avery mounted the horses and loped off in the direction of Wash Pollock's; the defendant, who got on his horse first, a little ahead of Avery. The witness turned and rode off, starting a little before either of the others. Avery and defendant started nearly due west, and the witness went direct home, in a course nearly due north. He was overtaken by Avery on a little prairie. They went around Summers' pasture, and Avery turned his horse in this pasture. From here witness and Avery went on around to the lot, the witness walking with Avery and leading his horse. After the horse had been turned into the lot at his, witness', house, Avery said "We've done a good night's work." To this the witness made no response. Avery then started to Pete Williams', but if he told witness why he was going witness did not hear him. He left whistling, and came back after awhile and stayed all night with witness. The defendant came to witness' house next morning very early, called witness out on his gallery, and told him the deceased had been killed. He then left and went back to Summers'. Avery and witness' family were in the house at the time.

The gun that was used in the killing was bought by the defendant in Jewett, some 17 or 18 miles distant. The defendant had a rifle which was out of repair, and he

wanted to take it to a smith, and the nearest he knew of was at Jewett. The defendant, who was furnishing witness with coffee, told him if he, witness, would go with him to Jewett he would get a supply of coffee. The witness went with him, and this was the only time the witness was ever in Jewett. They went into a store, and defendant was looking at a gun when the witness left him, but returned presently and found the defendant jewing the merchant on the price of the gun. He finally bought it for $25, giving a $50 greenback bill in payment and getting change. The merchant held the bill up to the light to examine it, when the defendant said: "You need not be examining the bill, it is good." The merchant said, "it is so seldom we get a $50 bill, I want to see if it is genuine." The defendant bought powder, caps and shot, and the two left town. The defendant carried the gun from town with him, and took it to an old house that had corn, shucks or something in it. This occurred two weeks or more before the killing.

After the killing Avery and defendant cautioned the witness about telling, and said that if they told, Bony Simms, John Simms and others would kill witness, and if witness told, they (Avery and defendant) would kill him. Defendant told witness to take the gun and leave the State, and informed the witness where he, the defendant, and Avery had hidden it, at a point on Lick Branch. Witness got the gun and hid it at another point, where he told Gregory he would find it, after he had been arrested and brought back to Texas. He first told Gregory to look for it where defendant had hidden it, and afterwards told him where he had subsequently hidden it, giving him a plot by which it could be found. The witness left the State when requested by defendant, but was furnished no money by him.

On cross-examination, the witness stated that he participated in but one conversation at the board-pile regard-

ing this matter, and knew of but one, which was that he had described. He did not see Pete Williams that night, did not speak to him, and Pete Williams did not join him, Avery, and defendant at the board-pile. It was "tolerably" dark that night, but the witness thinks that the stars were shining. When the defendant joined the witness in the field on the evening of the killing, he was 150 or 200 yards distant from Pete Williams, and could not see him, as both cotton and corn were growing between the points occupied by them. The sun was not quite down when the party left the field. The house in which the gun was concealed was situated 100 or 200 yards distant from defendant's house. It had a door-shutter, but no lock, and was not kept locked. The witness had no fire-arms on the trip to the deceased's house. There is no other road leaving the house of deceased going north but the one traveled by witness after the shooting, and Burns' and Pelton's houses can be reached by that road, and it is the only road to witness' house, and the most direct one to Summers'. It was scarcely good light the next morning when the defendant reached witness' house and told him that deceased had been killed. The witness stated that he went to the deceased's house next morning and saw the corpse, and admitted that it affected him somewhat, but did not remember that he cried.

The witness admitted that himself and family took dinner, on either the first or second Sunday before the killing, at the house of Peter Roehurst, but denied that he called Roehurst out behind the house and asked him if he had heard of his, witness', row with deceased, and on being answered in the negative, told said Roehurst that the deceased "run square over" him a few days before, and that he had never received such abuse and cursing,— that Roehurst told him that he should not have endured it, and he answered that he was not armed and

knew that deceased was, but that now he had borrowed the defendant's pistol, and if deceased run upon him again, one or the other would die then and there. The witness was not at the inquest, but was before the citizens' committee on the Monday following the tragedy, and there denied all knowledge of it. The citizens on that occasion opened his shirt and examined his shoulder. The witness owned no pistol, but that of the defendant was sometimes kept at his house. The witness remembered having taken a trip to Mexia a short time before the killing, but did not tell Thomas Wills on that trip that he had taken a pistol to town to have repaired. He did not remember having seen Wills next day, and knows that he did not send a message of any kind to deceased by Wills. He denied that Wills ever brought him such word from deceased as that he, deceased, "would not make friends with a d—d hog-thief." The witness did not intend to make Gregory believe that he would find the gun where he first told him "they" hid it. He did not tell Gregory that he had overheard defendant and Avery, in jail, talking late one night about where they had hid the gun, and could now tell him, Gregory, where he could find it. He remembered having a conversation with Henry Avery about deceased, near his, witness', well, a few days before the killing, but did not tell him in that conversation that deceased had cursed and abused him in the lane near Summers' mill. Did not tell him that deceased had accused him, witness, of stealing hogs, and that in the event deceased accused him, to his face, one or the other would die. All that witness told Henry Avery on that occasion was that when he came up with deceased in the lane, deceased asked him if he, witness, and "Bunk," the defendant, had eaten up all the meat of his, the deceased's, hogs witness and defendant had killed, and that he, witness, replied to deceased that he had killed none of his hogs,—that if any one had, it was

defendant, who had done so. Witness further asked
Henry Avery to tell deceased that he had killed none of
his hogs.

On re-examination the witness declared that if the de-
ceased's name was called by either Roehurst or himself
during the day the latter spent with Roehurst, he had no
recollection of it. The gun exhibited, though rusty, the
witness believed to be the gun used in the killing.

M. Levy, who was a merchant in Jewett in 1877 and
1878, testified for the State. He remembered having sold
a gun to two men. He saw the men but twice, and had
no positive recollection of their description. One of them
came into witness' store first, alone, and said that he and
a friend wanted to purchase a gun. He went out and
returned with another man, and they bought a gun from
witness' brother for $20, paying a $50 bill. When his
brother held the bill up to the light to scrutinize it,
one of the men said, "the bill is good," and witness'
brother answered that "it is so seldom we get $50 bills I
want to examine it." One of the men was taller than the
other. The witness could not identify the gun exhibited.
He had had such character and brand of guns in stock,
and so had other merchants of Jewett. The witness did
not remember having sold another gun and getting a $50
b ll on any other occasion. There is no material differ-
ence between this and the testimony of J. Levy.

J. I. Moody, for the State, testified that the citizens
having resolved to investigate the murder, he with others
was detailed to go to Ed. Summers' house and notify
parties there to appear before the citizens' committee at
the church, for examination. When the defendant was
called out of the house he walked to the fence, leaned
over it, placed one foot on a rail, and in that attitude talked
to the party. Witness explained to him what was re-
quired, and noticed that his appearance was unusual, and
that his foot trembled somewhat. Witness attributed

this unusual appearance and emotion to grief over his brother's death. The defendant said that he had no horse and could not go, but witness told him that he must.

Cross-examined, the witness said that the defendant did not hesitate to come out of the house when called, but said that he had been sick ever since his brother's death. He got his horse finally and went on to the church, following the party. M. C. Rogers, another of the party who notified the defendant to go before the committee, corroborated the last witness in every particular.

G. S. Gregory testified, for the State, that he was a justice of the peace at the time of the killing. He was notified of it on the same night, about 9 o'clock, by Wash Pollock and Nath. Pelton. He found the deceased lying on his back, dead, about four feet from his door. Examining the body next morning, he found three shots in the arm, two in the back and three in the side, made with buck-shot, and one large hole in the neck ranging downward, and another large hole in the breast, these last two being powder-burned. He found rotten yellow-brown paper strewn across the yard and over the ·house, which he took to be wadding fired from the gun. He saw wadding drawn from the gun at a former trial, and it appeared to be the same kind of paper. From the way the gun was evidently fired, and the position of things in the house, the deceased must have been sitting at his table, eating supper. There was a piece of bread broken off and lying by his plate, a piece of meat was in the plate, and a coffee pot was sitting to the right. A churn had been overturned and milk spilled on the floor. The chair was likewise knocked over. The witness extracted two balls from the body. These are similar to those drawn from the gun on exhibition.

As justice of the peace, the witness held an inquest on the body, the morning succeeding the killing. The

defendant was not present.   If Avery was about the prem-
ises next morning at all, witness did not see him.   Plum-
mer was present.   Avery was examined a little before the
inquest.   He has one crippled foot, and wears a piece of
wood or leather attached to his shoe that is not on ordi-
nary shoes.   The witness examined for tracks but found
none.   The witness was likewise one of the citizens' com-
mittee.   The defendant was before that committee, but
denied any knowledge of the killing, and could say noth-
ing about it except that some suspicious-looking men he
did not know passed his house the evening of the killing,
coming from the direction of the deceased's house.   This
fact was also stated by others.

Plummer, while in jail, told the witness where the gun
used in the killing was secreted, but on search witness
failed to find it.   A second time Plummer told him where
the gun would be found, but search resulted as in the
first instance.   A third time Plummer told him, and gave
him a diagram of the locality, and the gun was found,
one barrel empty, and one loaded.   The gun exhibited is
the same.

Cross-examined, the witness said that the second time
he went to see Plummer about the gun, Plummer told
him he could identify the locality, having overheard
Avery and defendant talking in the jail about where they
had secreted it.

Sam Johnson testified, for the State, that he was at de-
fendant's house on the night of the killing.   Himself,
Jack Sims, Wm. Vest, and James Pelton were staying
there.   He was about one mile from the house of de-
ceased, and about dark heard three shots, one louder than
the other two, and heard some one halloo as in distress,
at the first fire, and keep it up until the second shot fired.
Witness and the others then went to sleep, and about 10
o'clock were awakened by defendant and Wm. Pelton,
who told them that deceased had been killed, and that

they had just come from his house, but did not say who did the killing. The defendant was crying and appeared to be in distress. Neither witness nor Jack Sims went to deceased's house that night, nor did witness know whether or not the defendant went to the burial. The witness heard some one pass by him, going north and towards Plummer's, after the shooting, but did not see who it was. The defendant was not at his house when the witness heard the guns fire. When the party were talking about the killing that night, defendant said it might have been done by a party who went through the country the winter before. When the defendant left he said that his wife was sick, and was at Ed. Summers', and he was going to her.

The testimony of Viney Williams, for the State, is immaterial, except that it corroborates her husband, Pete, as to Avery's coming to her house about his clothes the night of the killing, and further, she testified that defendant asked her to let him run Pete off, assuring her that he was "playing off," was not working for her, and that she could get another husband as good as Pete. She heard two shots the night of the killing while she was at supper. Pete was on the gallery when the shots fired, and went off, but she did not know where he went.

Nathan Pelton, for the State, testified that he was living at Ed. Summers' at the time of the killing, and went with Wash Pollock to Gregory's the night that it occurred. He corroborated Pollock as to meeting a man in the road en route. He did not know, but thought this man was the defendant.

John Burns, for the State, testified that himself and Ed. Summers were on the gallery at Summers' house when they heard the gun fire. Defendant was not there. In about an hour after the gun fired witness saw defendant at Summers'. He was riding his black horse, and stayed but a few moments, talking about the killing.

During this conversation he asked witness if he had any idea who could have done it, and witness replied, "No, unless it was you." Defendant then said he and deceased had been at "outs," but that he would take up for deceased as quick as he ever would. Witness was at deceased's about 12 o'clock that night, but did not see the defendant. On cross-examination, he said that defendant left Summers' with others, to go to deceased's, but witness did not know whether he went or not.

John Sims testified that he found a track about 50 yards from deceased's house, the morning after the killing, which he took to be Avery's, going from the direction of the house, and other tracks which he could not recognize. He did not know when these several tracks were made.

John McKay testified that he saw Avery at deceased's house the next morning after the killing. He rode up to the house, hitched his horse at the fence and went in, but witness did not know how long he stayed.

E. Hobbs, for the defense, testified positively that friendly feelings existed between defendant and deceased four or five months before the killing.

W. J. Reeves, testifying for the defense, contradicted the witness Pete Williams in his denial of a conversation with witness at Yerbey's blacksmith shop. He affirmed that the conversation denied by Williams in his testimony did transpire between the two at the blacksmith shop.

The substance of the testimony of Peter Roehurst was a contradiction of the evidence of Plummer as to what transpired between them on the Sunday that Plummer and family dined with him. He positively averred that Plummer did call him out of the house, and that the conversation denied by Plummer did there transpire. On cross-examination the witness said that Plummer did not say that he had told defendant what he wanted with the pistol he had borrowed.

Henry Avery, for the defense, contradicted the testimony of Plummer, wherein Plummer denied having told him at the well that if deceased accused him to his face of killing his hogs, one or the other should die, but corroborated him as to what further Plummer said in that conversation about the conversation between him (Plummer) and deceased. This witness was a son of the Avery implicated in this same murder. Avery, Sr., and the deceased were on good terms in January and February, prior to the killing, and two or three weeks later witness saw them coming out of the woods together. They had been hunting.

Bony Sims, for the defense, testified that he was present on Wednesday night after the killing, and heard Pete Williams' statements about the matter. He told the witness that Avery and Plummer did the killing, and when asked if they were all who had a hand in it, he replied, " I think your brother (defendant) was knowing to it." The defendant, witness and Deavers went to the house of the deceased after the killing, that night. Neither witness nor defendant got down from their horses, and defendant said nothing about the manner in which the deceased might have been killed. The defendant was arrested at Summers', and witness was present. He had told defendant that morning that he would be arrested.

On cross-examination the witness stated that he examined the ground around deceased's house for tracks, and found one he took to be Avery's from the peculiarity of an attachment impression, which could have been made by such a one as Avery wore on the shoe of his lame foot. The witness, being re-examined, said he knew nothing of the feeling existing between Avery and deceased — had heard nothing said by deceased of a difficulty between them. He did know, however, that deceased and Plummer had had a difficulty. Avery had been to the house

of the deceased in the morning before the track spoken of was discovered, and witness could not say when it was made.

Jack Sims, for the defense, testified that he was a brother of deceased and defendant, and was at defendant's house with Sam Johnson and Vest on the night of the killing. Defendant and James Pelton came in late at night and told of the killing, and witness went out to look for his horse, but failing to find it, did not go to deceased's that night. Cross-examined, witness said that he was in Groesbeck on the day of the killing, but was at deceased's house next day, and found within 100 yards of the house a track they took to be Avery's from its peculiarity, and followed it to where some horses had been hitched, and from there followed the track about one mile. One of the tracks was that of witness' mare. He saw no horse tracks about the house of deceased. The witness did not know the state of feeling between the defendant and deceased,—they were friendly as far as he knew.

On re-examination the witness said he saw but one track he supposed to be Avery's, and did not remember at what hour of the day it was discovered. When the mare's tracks were first found they were in the path running east and west, going toward Wash Pollock's. The track of another horse than those of witness' mare was trailed for a mile, going from the house of deceased. The point where they had been hitched was about a quarter of a mile from the house. After the tracks were lost they were not again found, nor were the tracks going to the house found.

John Sims, for the defense, corroborated the statement of Bony Sims respecting the statements of Pete Williams about the knowledge of the killing, and the evidence of the last witness with regard to the tracks of the horses. In addition he stated that the horse tracks were trailed

to a point near Wash Pollock's yard, and then returned and tracked them near to Summers' mill, where they struck around the pasture.

Thomas Wills, for the defense, contradicted the statement of Plummer denying the conversation with him in Mexia, incorporated in the statement of Plummer's testimony. He affirmed that the conversation occurred as denied by Plummer, and about two or three weeks before the kil'ing.

John Baldwin, for the defense, stated that he arrested the defendant at Summers' about eight days after the killing. The arrest was made in the evening, and in the early morning of the same day the defendant had been informed that he would be arrested. Previous to the arrest the county had been guarded by the citizens, but was not guarded at the time of the arrest.

The questions raised in this court are disclosed in the opinion.

*Farrar & Prendergast*, and *Herring, Kelley & Williams*, for the appellant. While two or more offenses may be charged in separate counts of the same indictment, yet when all the evidence on behalf of the prosecution has been introduced, on motion of the defendant the State should be required to elect upon which count to try him.

The indictment in separate and distinct counts charges appellant as principal and as an accomplice.

When the evidence of the State had been introduced, appellant moved the court to require the county attorney to make an election, so that he might know the charge upon which the State relied. This motion was overruled by the court and exception reserved. *McKeen* v. *State*, 7 Texas Ct. App. 631; *Dalton* v. *State*, 4 Texas Ct. App. 333; *Fisher* v. *State*, 33 Texas, 792; *Lunn* v. *State*, 44 Texas, 85.

The State is not required to elect between different

grounds of aggravation set out in an indictment for aggravated assault. *Waddell* v. *State*, 1 Texas Ct. App. 720. Nor in a murder case, because the indictment charges in a single count different modes by which death was caused. *Gonzales* v. *State*, 5 Texas Ct. App. 584; see also *State* v. *Edmondson*, 43 Texas, 162, and *Dill* v. *State*, 1 Texas Ct. App. 278. In the last case, says Ector, presiding judge: "The grand jury may be well satisfied that the homicide was committed, but not satisfied with the mode of death; and in order to meet the evidence as to the mode of death, as it may be developed on the trial, they are allowed to set out the mode in different counts, and then if any one of them is proved it is sufficient to support the indictment." Dill and others were jointly indicted for the murder of Reuben Johnson. The indictment contained two counts, one of which charged the murder to have been perpetrated by cutting the throat of deceased, and the other that it was committed by hanging. Says Justice Moore, in *State* v. *Edmondson, supra:* "If distinct and independent offenses are charged in the indictment, the objection of duplicity may be as applicable to it, if not more so under the Code, than at common law."

The distinction is manifest that while different modes in which an offense may have been committed may be charged in single or separate counts and the State not be held to an election, that when in the same indictment, in separate and distinct counts, substantive and independent offenses are charged, on motion made at the proper time, as shown in the case at bar, the state should be required to elect upon which count to try. The reason for this distinction is equally clear. There can be no prejudice to the defendant, or violation of any principle of law, in allowing the State to allege and prove, either in single or separate counts, as many different modes in which an offense has been committed, as the grand jury or pleader

has been advised; and if any one is warranted by the evidence, the conviction should be sustained. But the principle that only one offense should be charged in an indictment, and if more than one, that the prisoner cannot be convicted of two offenses on the same trial; and that therefore the State should be forced to an election at some stage of the proceeding, is fundamental. The only question seems to be at what time in the progress of the trial the State should be required to make the election. About this there is some contrariety of opinion; but our courts, as will be seen from the authorities above cited, have established the rule observed by appellant, as shown in his bill of exception upon which this assignment of error is based. The reason for this principle is two fold: 1st, that the prisoner may know what specific charge or offense he is required to answer, and prepare for his trial accordingly; 2d, that in case acquittal or conviction, he may plead the judgment in bar of another trial for the same offense. From this it is quite apparent that it makes no difference that the different offenses charged in the same indictment have the same penalty.

The evidence of Pete Williams that appellant said to Avery, speaking of "Bill," on a certain occasion, some time during the winter preceding the murder, "night has no eyes," was too remote, immaterial and misleading.

In the winter before deceased was killed, Pete Williams testifies he went to appellant's to get some meat, who said he had none, but they could kill a hog; and while waiting for the water to heat, he heard Avery say to defendant: "Bunk, that rascal was at my house last night, and cursed me for everything he could think of." Defendant says, "Who?" Avery says, "Why, Bill." Defendant says, "He did?" Avery says, "Yes; what would you do about it?" And then defendant says, "Night has no eyes."

Admitting that the deceased was personated as "Bill" in this evidence of the mysterious, epigrammatic and

eaves-dropping witness, Pete, and that the poetical and laconic expression imputed to appellant was used by him, and that he meant if he was in Avery's place, and deceased came to his house at night and cursed him, he would kill him, where is the predicate for its introduction against appellant? There is no evidence that deceased ever went to his house in the day or night-time and cursed him, or gave him any provocation to execute such a threat, if it can be so construed. And if a threat, it is too vague, indefinite and remote. It stands isolated and alone, and in no way connected with the homicide that occurred some five or six months thereafter; this and nothing more, conceding the worst possible construction that can be placed upon it. But can the expression be fairly held to mean a personal threat of appellant against deceased? Certainly not; and if not, then it was immaterial and misleading.

Evidence of an accomplice as to immaterial circumstances, uncorroborated, and not tending to connect the prisoner with an alleged homicide, is inadmissible; and when admitted over objections, as in this case, a reversible error.

The accomplice, J. T. Plummer, with great minuteness and circumstantiality, testified to the purchase of a double-barreled shot gun and some shot and powder by appellant in Jewett, some seventeen or eighteen miles from his residence, two or three weeks or a longer and indefinite time, before the deceased was killed; the concealment of the gun in an old house some one or two hundred yards from his residence, which had a door shutter but no lock to it; the getting of the gun from this old house the evening of the homicide; its concealment afterwards by appellant; the subsequent finding and re-concealment of it by himself (the accomplice); and his information to the witness Gregory, whereby it was found and identified by said Gregory. Appellant's objection to, and motion to

exclude, after admission of this evidence, were both overruled.

The State also proved in this connection, by two witnesses named Levy, over appellant's objection, that they were merchants in Jewett, and that "They sold a double-barreled gun some two or three years ago (before this trial), — could not fix the time,— to two men, strangers to them, whom they did not know and could not identify, for $20, and that a $50 bill was paid, which one of them held up before his eyes and the light to examine and satisfy himself it was genuine. These witnesses could not identify the gun in court as one they had sold, but said they had some guns of the same make or brand some two or three years ago; that one other merchant in Jewett had a similar gun, and that merchants generally handled the same gun."

The State also proved in this connection by the witness Gregory, that the gun produced in court was the same he found under the directions of Plummer, that one barrel was not discharged, that he saw the load drawn out of it, that the wadding was brown rotten paper, and the kind he found on the ground from the fence to where the body of deceased was, and that the shot were similar to those he took out of deceased.

When fairly and legally sifted there is no evidence, direct or circumstantial, that connects appellant with this gun story, save that of the accomplice, Plummer. No witness sees them *en route* to or in Jewett. The witness, Levy, fails to identify either the prisoner or the gun. The circumstance as to the examination of a $50 bill may be true, and yet it does not logically or necessarily or legally follow that appellant used such a bill, was present at the time, or even bought a gun under any such circumstances. The accomplice is only supported to the extent that he and some other man bought a gun of the merchant Levy. It is by no means strange but natural that an accomplice,

whose self-imposed task and business it is to free his own neck from the halter, by inculpating another, should insert into the web and woof of his tangled story as much immaterial truth, susceptible of corroboration, as possible. So if it be conceded that a gun was bought, there is no evidence, other than that of Plummer, that appellant was in any way connected therewith.    There is no evidence, save that of Plummer, that appellant concealed any gun in an old house, or that on the evening of the killing he procured any gun from that old house, or from any other place, or that he shot deceased with a gun, or that he concealed the gun that was produced on the trial, or that he had ever seen or handled it.    That Plummer knew where it was hid is certain, because he directed Gregory where to find it; but this does not confirm his story that appellant hid it the night of the murder, and afterwards told him where he hid it, and that he found it and hid it in another place, just before fleeing from the country.    The jury, doubtless, received and acted upon the evidence of the accomplice, as to this gun story, as true in all its details, because they failed to discriminate that confirmation of his acts and knowledge in one or more particulars, wherein he connected appellant with himself, was no legal evidence as to the latter.    As well said by Justice Clark in *Robertson* v. *State*, 9 Texas Ct. App. 209: "It is always a difficult task for a jury to comprehend this provision of law and to discard from their unpracticed minds the testimony of the accomplice in the search for the necessary outside corroboration.    The witness testifies before them as do other witnesses.    His statements are usually plausibly connected, and apparently sincere.    Usually his own life or liberty is at stake, and dependent upon the conviction of his alleged confederate, and his confessed infamy is not likely to deter him from making any statement he may deem essential to his own preservation.    He fixes guilt with almost absolute

precision; and the circumstantial details he gives in evidence, added to his apparent or real desire to reveal all the facts attendant upon and constituting the crime, is calculated to easily impose upon a jury, and to cause them to place entire confidence in the truth of his evidence. They are likely to forget his infamy, and in an honest and laudable desire to punish the outrage upon the law, they adopt his evidence as a proper basis for their verdict, without much regard as to whether it is corroborated by other evidence or not."

In admitting this evidence as to the gun story, the well-timed admonition of Justice Winkler on former appeal of this case (8 Ct. App. 248) was disregarded. Says this jurist:

"On another trial, should the testimony be the same or similar to that of the present, the attention of the court is specially directed to the necessity of confining the jury, in their deliberations, to the testimony which tends to connect the defendant with the offense committed, to the exclusion of those phases of the testimony which have no such tendency."

The verdict of the jury is not supported by the evidence; and for this, the court erred in not granting a new trial.

Outside of the evidence of the accomplice, Plummer, the record will be searched in vain for anything showing, or tending to show, that appellant was present and participated in the murder. Instead of corroboration on this point, Plummer is flatly and pointedly contradicted both by the direct evidence and by the circumstances, or physical facts.

While there are some few minor circumstances of suspicion, they not only fail to engender conviction, but they are overborne by the circumstances in favor of appellant. His absence from his home and that of Summers', where his sick wife was, is reasonably accounted for, even if the burden rested on him, by Pete Williams, who shows

that on the evening of the killing, about an hour by sun, appellant, who had been hunting his mules all that day, said he had hunted every place but one, and that he would then go there; when Pete said to him, "Hell, it is nearly night now." When notified the morning of the day that he would be arrested, and had from then until that evening to make his escape, instead of fleeing as a guilty man would do, he sought the officer who had the warrant for his arrest. And how completely are these few minor circumstances of suspicion, born of ignorant minds, with whom, after such a murder and such an accusation, "trifles light as air are proofs as strong as holy writ," dissipated, like fog before the rising sun, by his going to the house of Plummer very early the morning after the murder, and calling him out and telling him about the killing of his brother. Such conduct is utterly inconsistent with, and absolutely negatives, the idea of appellant's guilty knowledge, or joint participation in this alleged fratricide.

In support of the proposition that the verdict of the jury is not warranted by the evidence, and that for this cause a new trial should have been granted, we refer to the following authorities: *Simms v. State,* 8 Texas Ct. App. 230; *Jones v. State,* 7 Texas Ct. App. 457; *Coleman v. State,* 44 Texas, 109; *Tollett v. State,* 44 Texas, 97; *King v. State,* 4 Texas Ct. App. 256; *Jones v. State,* 4 Texas Ct. App. 436; *Barnett v. State,* 5 Texas Ct. App. 113; *Griffith v. State,* 9 Texas Ct. App. 372.

*Thomas Ball,* Assistant Attorney General, for the State.

White, P. J. Appellant's former appeal in this case was from a judgment of capital conviction of murder of the first degree. *Simms v. State,* 8 Texas Ct. App. 230. His appeal in this instance is from a judgment of conviction of murder of the first degree, the punishment affixed

being imprisonment in the State penitentiary for the term of his natural life.

Two counts are contained in the indictment; one (the first) charging W. W. *alias* Bunk Simms (appellant) alone with the murder, whilst the second charges that the crime was committed by one J. T. Plummer, but that before its commission he was incited, hired, encouraged, advised and aided to and in its execution by W. W. *alias* Bunk Simms, this appellant. In the first count the appellant is charged as a principal offender, and in the second as an accomplice to the murder.

By the second bill of exceptions it is shown that on the trial, after the evidence for the prosecution had been introduced, "the defendant moved the court to require the State to elect upon which count of the indictment it would try the defendant." The motion was overruled, and the ruling is claimed to be and forms the first error complained of in the able brief of counsel for appellant.

It cannot be gainsaid but that two separate and distinct offenses were alleged, since under neither of said counts could the defendant have been convicted as charged in the other,— the rule being well settled that when a party is charged as a principal offender he cannot, under the Code of this State, be convicted as an accomplice, nor *vice versa*. *McKeen* v. *State,* 7 Texas Ct. App. 631. This difficulty was doubtless felt and appreciated by the pleader, and hence the two counts. Had the rule been otherwise, there would have been no real necessity in this indictment for more than the single count charging defendant in the ordinary form with the commission of the murder.

There being two counts, setting out separate and distinct offenses, should the State have been compelled to elect? Our Supreme Court has declared, in *Lunn* v. *State,* 44 Texas, 85, that "when two offenses are charged in an indictment or developed by the evidence, the district attorney should be required to elect on which of the charges

he intends to claim a conviction, as soon as he has examined the witnesses far enough to identify the transaction; and as a general rule the election should be made before the defendant offers his evidence." This rule has been followed by subsequent decisions of this court. *Dalton* v. *State*, 4 Texas Ct. App. 333, and cases cited. As applicable to the case here presented, we cannot, perhaps, better illustrate the rule and its necessity than by drawing the distinction between the two offenses with reference to the difference in a most material respect which exists as to the legality and admissibility of the evidence by which the two charges are susceptible of being proven.

Under the count charging the defendant as a principal, whether alone or in connection with others, the prosecution might have shown and have established not only the existence and actual perpetration of the deed in connection with other parties, but, having once established such conspiracy, would have been entitled, as against the co-conspirator on trial, to prove any act, declaration or admission of the confederate or confederates not on trial, done and said in pursuance of the common design and in furtherance of it up to the time of its commission, but no further. "Acts, conduct and declarations of each confederate, made and done during the pendency of a criminal enterprise, are competent evidence against all engaged in it, as each is supposed to approve and sanction all that was done or said in furtherance of the common object." *Cox et als.* v. *State*, 8 Texas Ct. App. 256; 1 Greenl. Ev. §§ 111 and 233. Such acts, conduct and declarations are held to be admissible as part of the *res gestœ;* but subsequent narrations, confessions or admissions stand upon a different principle, as the presumption is that they were not made in pursuance of a common design, and consequently they cannot be admitted as evidence to affect any one except the party by whom they were made. *U. S.* v. *Hartwell*, 3 Clifford, 221; *Draper* v. *State*, 22 Texas, 400;

*McWilliams* v. *State*, 44 Texas, 116; *Preston* v. *State*, 4 Texas Ct. App. 186. And especially is this so with regard to confessions made by one party after the deed has been committed; the general rule of law being that a man's confessions of guilt can only be used against himself.

Such rules, however, do not obtain where an accomplice is being tried separately from his principal. Accomplices under our Code would in most of the States and at common law be denominated accessories before the fact, and, save in cases specially excepted, the rules applicable elsewhere to the latter with us also apply to the former. *McKeen* v. *State*, 7 Texas Ct. App. 631; *Arnold* v. *State*, 9 Texas Ct. App. 435. Where a party is being tried as an accessory before the fact, or as an accomplice, it is essential as a predicate for, or condition precedent to, his guilt, that the State should establish the guilt of the principal; for his guilt is dependent on that of the principal, whether the latter is on trial or not. Whart. Crim. Ev. § 602; *Arnold* v. *State*, *supra*. But in thus establishing the guilt of the principal on the trial of the accomplice, the prosecution, when the confederacy between the two has been shown, is not limited to what was said and done by the principal before the consummation of the act; but, in addition thereto, the acts and conduct of the principal immediately following the commission of the deed, and tending to show he committed it, are competent evidence to prove the guilt of the principal. Whart. Crim. Ev. 702; *State* v. *Lewis*, 45 Iowa, 20. In other words, "whatever naturally and usually follows immediately on the commission of a crime,— the act of flying and escaping from the place, concealment and disguise of the person, and other acts and conduct of the like character, such as in and of themselves naturally imply connection with the commission of the crime,— are evidence of guilt, not so much in the nature of confessions and admissions as be-

cause they are the usual and habitual concomitants of the crime on trial. The transaction investigated on the trial,— the *res gestœ*,— consists not merely of the direct criminal act which constitutes the legal offense; the necessary preparations for the perpetration of the crime, the arrangements for escape, the act of escaping, concealment and disguise of the person, and other similar acts and conduct, are all parts of the transaction such as common experience shows naturally belong to the crime, and are habitually connected with the commission of the offense. In this point of view, the acts and conduct of the principal immediately following the commission of the offense are competent evidence to prove his guilt on the trial of the accessory" (or accomplice). *State* v. *Rand*, 33 N. H. 216; *People* v. *Stanley*, 47 Cal. 113.

And so also with subsequent confessions made by the principal. We are aware that a contrary rule was formerly held. Mr. Russell, in his celebrated work on Crimes, says: "Upon an indictment against an accessory, a confession by the principal is not admissible to prove the guilt of the principal; it must be proved *aliunde*." 1 Russ. on Crimes (9th ed.), side p. 76. This doctrine is based upon the leading case of *Rex* v. *Turner*, 1 Moo. Cr. Cas. 374. In the well considered case of *Hartwell* v. *U. S.* 3 Clifford C. C. R. 221, Judge Clifford in discussing Turner's case says: "If viewed as deciding that the confessions of the principal in a case where the principal and accessory are indicted and tried together are not admissible to prove the guilt of the principal, it is clearly opposed to the general course of decisions in criminal cases for centuries, and it is difficult to see why any different rule should prevail where the principal is first convicted, provided they are both joined in the same indictment. Many cases arise where criminal justice cannot be administered if the rule is as supposed by defendants. Take, for example, the case of an accessory in murder, where the principal is

not upon trial because he pleaded guilty in the presence of the court and jury. Conviction of the accessory cannot take place without first proving the guilt of the principal, and his guilt cannot be shown without proving he committed the homicide with malice aforethought. Previous threats are the more usual evidence of malice in trials for murder, but if those are inadmissible then the accessory must be acquitted, however flagrant his guilt. . . . Malice aforethought is the characteristic criterion by which murder is distinguished from manslaughter, and many cases of secret homicide arise where there is no proof of antecedent threats or lying in wait; and in such cases resort is necessarily had to circumstances and frequently to the subsequent conduct and declarations of the prisoner to prove that material allegation of the indictment. Such evidence is clearly admissible against the principal when he is on trial, and if it is not admissible in the trial of the accessory to confirm the *prima facie* presumption resulting from the record of the principal's conviction in a case like the present, then there can be no such confirmation; which cannot be admitted."

Our statute provides that "an accomplice may be arrested, tried and punished before the conviction of the principal offender, and the acquittal of the principal shall not bar a prosecution against the accomplice, but on the trial of an accomplice the evidence must be such as would have convicted the principal." Penal Code, art. 89. In *Arnold's* case it was said, in discussing a similar question, "It being then necessary for the State to show the guilt of the principals, all legal evidence of whatever character is admissible. Therefore motives, threats and confessions of the principals, and in fact evidence from every legal source, is competent." 9 Texas Ct. App. 435. Another rule of law equally well settled, and which should not be overlooked in this connection, is that "deliberate confessions of guilt are among the most effectual proofs in the

law, and that rule is applicable to the party who made the confession as well when he is tried with others as when he is tried alone." 1 Greenl. Ev. §§ 215, 233; Ros. Crim. Ev. 37, 52.

Now let us apply these rules and principles of law to the case before us. Appellant Simms was alone indicted and alone tried for the murder. Plummer, the alleged principal in the second count, if indicted, was not joined in this indictment,— was not being tried,— but on the contrary had turned State's evidence and was a principal witness on the trial against Simms. On the trial the prosecution was permitted to prove against Simms the acts, flight, declarations and confessions of Plummer after the homicide, and particularly certain statements made by him after his arrest and in the absence of Simms, which led to the finding of the gun with which he said the murder had been committed by Simms. As we have seen from the authorities quoted, such evidence might have been admissible and legitimate to prove Plummer's guilt, in only two aspects of the case: 1st. As confessions against himself had he been jointly indicted and tried, though not evidence even in that event against his confederates or co-defendants, because the offense had been consummated before these evidentiary facts and circumstances existed. 2d. They were admissible evidence to prove Plummer's guilt as a principal under the second count in which Simms was charged as his accomplice, because Plummer's guilt had first to be established as a condition precedent to Simms' conviction.

But Plummer not being on trial with Simms, and Simms being charged alone as a principal in the first count, no act, declaration, admission or confession of Plummer after the deed was committed was admissible as evidence against Simms on his trial upon the first count. Under one count the evidence was admissible; under the other wholly inadmissible. There was no way by which

its opposite relation to the two counts could be reconciled. It must be manifest without further argument that the court should have compelled the election demanded by the defendant, and that in refusing to require the State to elect upon which count a conviction would be claimed a serious error was perhaps committed to the prejudice of the defendant.

Eight bills of exception were saved by defendant to the admission of testimony. Without discussing them *seriatim*, we are of opinion it is sufficient to classify them generally under two heads,— the evidence, outside the testimony of the accomplice Plummer, being almost entirely of a circumstantial character. We will, then, formulate the evidence under two heads: 1st. Circumstances which tended to throw light upon the transaction; and 2d. Confessions, statements and admissions made by other parties after the transaction and in the absence of this defendant. The former were clearly admissible; the latter clearly inadmissible. Under the former the court did not err in permitting Pete Williams to testify as to a conversation he heard between defendant and Avery with regard to a difficulty between the latter and the deceased, in which the defendant advised Avery that "night had no eyes." It was a circumstance, however slight, tending to show the feeling of defendant towards his brother, the deceased; and in cases depending wholly upon circumstantial evidence the mind seeks to explore every possible source from which any light, however feeble, may be derived. *Noftsinger* v. *State*, 7 Texas Ct. App. 301. And so with regard to the purchase of the gun by defendant at Jewett. With regard to this fact the evidence of the accomplice was legitimate; as was also the evidence of the merchant from whom it was purchased, tending to corroborate the accomplice. Nor was there any error in permitting Esquire Gregory to testify where he had found the gun, and that in drawing the load from

the barrel which was not discharged he found wadding upon the load similar to that found by him in the yard of the deceased recently after the homicide. To this extent there is no objection to Gregory's testimony, though objectionable, as we shall presently see, in other respects.

In cases of circumstantial evidence, no definite line of demarcation can be drawn with regard to facts proximate and remote. The test is, do they tend to throw light upon the transaction? Greater latitude is allowed in the presentation of evidence where it is purely circumstantial than would be admissible where a conviction is sought upon direct and positive testimony. *Ballew* v. *State*, 36 Texas, 98. The necessity for admitting circumstantial evidence in criminal matters is even greater than in civil matters, and it is adopted the more readily in proportion to the difficulty of proving the fact by direct evidence, and because of the ease with which it can be 'disproved by the proof of other facts inconsistent with it.

Nor was any error committed in allowing Dr. Camp to testify to and reproduce the evidence given by the deceased witness, Wash Pollock, on the former trial. The witness fully qualified himself to do so. Whatever may have been the doctrine formerly held, it seems now well settled that the person called to prove what a deceased witness testified on a former trial is not required to repeat the precise words of such witness, but it is sufficient if the witness is able to state the substance of what was sworn on the former trial. 1 Greenl. Ev. 165; *Black* v. *State*, 1 Texas Ct. App. 368; *Dunlap* v. *State*, 9 Texas Ct. App. 179.

We are of opinion, however, that the court did err in permitting the witness Pete Williams to testify to the conversation between Avery and Plummer after the homicide and in the absence of defendant. No acts or declarations of theirs were evidence against this defendant under such circumstances.

It was also error to permit the confessions and declarations of Plummer, made after his arrest, to Squire Gregory and others, to be introduced against this defendant under the first count; and, if admitted under the second count, the jury should have been expressly charged that they would consider them only with reference to Plummer's guilt, and not as evidence of the guilt of defendant, except so far as his guilt was dependent upon the establishment in the first instance of Plummer's guilt. The charge nowhere limits the evidence to this object, and to that extent the charge failed to apply the law to the facts under the second count, and was insufficient.

Other matters assigned as error and discussed in the able brief and argument of counsel for appellant are not passed upon and decided, for the reason that they are not likely to arise again or become of any importance upon a future trial of the case.

For the errors pointed out and discussed in this opinion the judgment of the court below is reversed and the cause remanded for a new trial.

*Reversed and remanded.*