[No. 1447.]

## Ed. T. Pinckord v. The State.

1. Practice—Continuance—New Trial.—See the statement of the case for facts set up in an overruled application for a continuance, which, taken in connection with the facts proved at the trial, and being material, and not deficient in probability of truth, entitled the defendant to a new trial.

2. Same.—Whether or not an application for a continuance is sufficient in law, is the question for the court to determine when the application is heard, and an erroneous refusal of the same at the time is not rectified by the subsequent discovery that the desired evidence is cumulative.

3. Continuance.—It is not now, nor has it ever been, the law that an application for a first continuance shall aver that the desired testimony cannot be obtained from any other source known to the defendant. Such averment is essential only in subsequent applications.

4. Evidence—Alibi.—It is no reason for its exclusion that the desired evidence is cumulative proof of the defense of *alibi*. See the opinion *in extenso* for evidence excluded on this ground, but *held* competent and of first importance to the defendant.

5. Same—Practice.—In a prosecution wherein the wife was the alleged injured party, it was proper, as tending to establish motive, to permit the State to prove that the wife had instituted a suit for divorce, and that the same was pending at the alleged time of the offense; but it was error to permit the allegations of her petition in the divorce suit to be read to the jury as evidence, and especially so without explanation as to how far and for what purpose they were to be considered. More especially was it error to admit in evidence the judgment or decree of divorce, when it appeared to have been rendered subsequent to the alleged commission of the offense.

6. Same—Case Stated.—A witness was permitted to testify that, at a time when the defendant was not present, he, the witness, directed his wife not to lend his gun to the defendant, as he apprehended a purpose of the defendant to kill a party other than the alleged injured party. *Held*, error, as incompetent, and as violative of the primary rule "that the evidence offered must correspond with the allegations, and be confined to the point in issue." See the opinion *in extenso* on the subject.

Appeal from the District Court of Polk. Tried below before the Hon. E. Hobby.

The indictment charged that the appellant, in Polk county, Texas, on the fifteenth day of June, 1879, mingled a noxious

potion, strychnine, with water with the intent to murder Mollie Pinckord, Leila McCoghren and one Turner.   His trial resulted in conviction, and a term of six years in the penitentiary was the punishment awarded by the jury.

Mrs. Mary J. Pinckord, who at the time of the commission of the offense, was the wife of the defendant, testified, for the State, that on the sixth day of June, 1879, she was living in a house on the place of Sim Turner, the father of the first husband of the witness, then deceased, and was under the protection of the said Sim Turner.   At about half-past four o'clock on that evening she went to Mr. Sim Turner's house for a bucket of water, leaving her little son, Mr. Turner's grandchild, and Leila McCoghren at the house.   She returned with the water, cooked and ate supper, and went out to lock up the smoke house, but finding the keys gone left it unlocked.   Thence she returned to Turner's to go to the cow pen, and Leila McCoghren returned to the house with the children.   Preparing to go to bed, Leila McCoghren went to the water shelf and took a drink of water. Immediately she declared there was something in the water, and that she thought it was quinine.   The witness told her she was mistaken, and gave her little boy a drink of the same water. Directing the children to retire, the witness took her seat and commenced reading.   Presently she heard some one whistling, and got up and shut the door.

A few minutes after the witness closed the door she heard the defendant calling her by name from the outside of the house. She knew that the person calling was the defendant.   She took the bucket of water, intending to heat the water and throw it on the defendant.   She poured a gourd full in the skillet, and noticed that it contained some white substance resembling broken pieces of rice, some of which floated and some sank to bottom.   She sat the bucket down, ran to the door and called for D. Turner, and then took up the bucket and started to Mr. Turner's with it, Leila and the child going with her.   Arriving, she found Mr. Sim Turner, D. Turner and Mr. White at Sim Turner's, all of whom examined the water in the bucket, and Mr. Sim Turner pronounced the white particles poison, and gave lard to the children who had drunk of the water.   Mr. Turner preserved some of the particles and some of the water in a phial, and sat the bucket in the smoke house and locked it up.   Thereupon Leila, Miss Turner and the witness returned to the witness's home with a light, and locked it up.

The water shelf on which the bucket sat at the witness's house was outside of the house and near the door. Near and around this shelf the witness saw footprints of a person who had stood over and moved around the water shelf. These tracks were number seven, and this track the witness recognized as that of the defendant.

The witness was the widow of W. Turner, son of Sim Turner, at the time of her marriage to the defendant. She and the defendant lived unhappily together. After the birth of their only child, the defendant beat and abandoned the witness. The last time the defendant beat the witness was in the April preceding the June of this offense. Separation of the parties followed this violence, the defendant threatening to kill the witness if she should do anything which would occasion him trouble. On that occasion he took their five months old child from her by force, and told the witness that if she attempted to recover it he would cut her open.

Subsequent to this trouble, but prior to the attempted poisoning, the witness brought a suit for divorce. She obtained a decree of divorce, and also a decree giving her possession of the child, which the defendant had kept at the house of a Mrs. Waters. The sheriff brought the child to her, but, as she was afraid to retain it, after the threats of the defendant, she sent it back to Mrs. Waters. The defendant had been to the witness and told her that she could not keep the child at Mr. Turner's negro house,—that if she did, there would be no living in the county.

The place of separation of the parties was at their former home, four miles from Mr. Sim Turner's, where she took up her abode afterwards, and at which place this poisoning was attempted.

The defendant was tried before an examining court, on or about the eighteenth of June, 1879. The witness may have said to Mr. McConico, the constable, on that trial, that she had told all, and some things that she did not know. If she did, it was in a joke, but she did not remember making such a statement. The witness was examined for three days on that trial, and was worn out. The witness did go to her brother-in-law's, Zack Burns's house, on the second day after the attempted poisoning, and told of the affair, but she did not remember saying that she would like to see the defendant mobbed. She thought he ought to have been, and may have said so.

Sim Turner, for the State, testified that on the night of June 6,

1879, Mrs. M. J. Pinckord brought a bucket of water to his house, which water contained particles of a white substance resembling rice broken up, but which the witness then pronounced poison. After Mrs. Pinckord told him of the occurrences at her house, the witness extracted several of these white particles from the water, and dipped a phial full of the water containing some of the particles for the purpose of submitting them to chemical test. He also gave the children who were said to have drunk some of the water a quantity of lard to act as an antidote to the poison.

A phial and paper were here exhibited and identified by the witness as the ones spoken of by him. This paper, containing particles of the white substance, and the phial containing water and particles as described, were, on the day succeeding the events narrated, taken by the witness to Livingston and delivered to Doctor McCordell. The bucket, when it first reached the house of the witness by the hands of Mrs. Pinckord, contained a scant gallon of water. The water in the phial had undergone no change from the time the witness dipped it from the bucket, until he gave it to Doctor McCordell. It had undergone no change from the time it was returned to the witness by the doctor until the present time. The girl Leila complained that night of pains in her stomach and breast.

On the morning after the alleged attempted poisoning, the witness went to the house occupied by Mrs. Pinckord, about one hundred and fifty yards distant, and discovered the tracks of a man about and around the house and gallery. He found these impressions of a man's foot about the point from which Mrs. Pinckord stated that the defendant called to her. He found the same impression near and about the water shelf. These tracks, the witness followed to a path leading towards Mrs. John Waters's, and tracked them for about three hundred yards. He took the tracks to be of about a number seven shoe, and thought they resembled the tracks of the defendant. A man could stand in the tracks at the water shelf and drink from a bucket on the shelf.

T. D. Pace and D. Turner, who were with the witness when he followed the tracks to the path spoken of, continued pursuing them for a distance of seven miles. The paper exhibited, being a druggist's label for a small phial, and bearing the printed words: "Chrystals $\frac{1}{8}$ oz. Strychnine—Suggestion to Trappers—Wrap the strychnia in oiled paper when inserting it in the bait,

as when decomposition of the meat occurs from long exposure, a bitter taste is communicated to it from the strychnia if unwrapped, and the animal rejects it." This paper has been in the possession of the witness since he received it from Pace. After Mrs. Pinckord reached the witness's house that night, he started to get his gun and go down to Mrs. Pinckord's residence, but was persuaded not to by the women.

Leila McCoghren testified, for the State, that she was at Mrs. Pinckord's house on the night in question. She went to the water bucket and took a drink of water, and told Mrs. Pinckord that it had either quinine or coffee in it. Later they went to Mr. Sim Turner's, when he gave the witness some lard to take. After that she had pains in her stomach.

D. Turner testified, for the State, that he was at his father's house, on the night when Mrs. Pinckord, Leila McCoghren and the children came with the bucket of water. The next morning he, his father, Sim Turner and T. D. Pace went to Mrs. Pinckord's and found tracks as described by the other witnesses. These tracks they followed into the path leading towards Mrs. Waters's, where the defendant lived at that time. They followed this trail in that direction for about seven miles. There had been a rain on that day, before the tracks were made, and they were easily followed. At a point about three miles distant from Sim Turner's, and on the trail of the tracks described, Pace found the label exhibited by Sim Turner. Pace measured the tracks and found that they were made by a number seven or eight shoe. This track led from Mrs. Pinckord's into the road, past Dave Nichols's house and in the direction of Mrs. Waters's, where the defendant then lived. Mrs. Waters lived about twelve miles distant from Mrs. Pinckord's.

The narrative of T. D. Pace, who testified for the State, was essentially the same as that of D. Turner. He stated, also, that he measured the tracks at several points in the space of the seven miles he followed them, and found them, in every instance, to correspond with those he found in Mrs. Pinckord's yard.

Cross-examined, the witness stated that he testified on the examining trial of this defendant, and what he stated there was correct. Refreshing his memory, he recalls that he stated on that trial that he did not follow the tracks from Mrs. Pinckord's house immediately to the road. The witness noticed a peculiarity about the tracks, both at the house and along the road.

The left shoe was slightly turned over, and the seam of the shoe made an impression on the ground. The right shoe was straight.

Doctor J. H. McCordell, testifying for the State, said that he was a physician and druggist of thirty years' practice, and a graduate of the Medical College of South Carolina. On or about June 7, 1879, S. D. Turner brought him a phial of water containing some particles of a white substance, and also a paper containing particles of the same substance. These particles the witness subjected to a chemical analysis, and found them to be crystals of strychnia. He described minutely the tests employed, and positively pronounced the particles to be crystals of strychnia, a deadly poison. The witness proceeded to describe the solubility of crystal of stychnia, and declared that its presence in cold water, in the proportion of one grain of the crystal to thirty thousand grains of water, would render the water so bitter that it would scarcely be drank in quantities sufficient to prove fatal, as its bitter taste would readily be detected. The effect of taking lard or oil after taking this poison would be to wrap the poison in the lard, and so carry it off through the bowels, and by that means prevent its introduction into the circulation. While lard or oil is not now regarded as really an antidote for strychnine poison, it is still considered a popular remedy, for the reason stated. A person taking strychnine in water in the manner described by Mrs. Pinckord would not be likely to drink enough to result fatally.

The pleadings in a suit by Mrs. M. J. Pinckord against the defendant for divorce, and the decree awarding divorce, were next introduced by the State.

Alex Lowe testified, for the defense, that two roads led from Mrs. Pinckord's to Mrs. Waters's residence. The shortest of these routes was from twelve to fifteen miles.

J. B. McConico testified, for the defense, that *en route* from the hotel of Mrs. Andreas to the court house in the town of Livingston, at the time of the examining trial in this case, Mrs. Pinckord said to him that she did not understand why they wanted her, as she had already told all she knew, and a great deal that she did not know, about this case. Her face was from the witness at the time, and he could not say whether or not she was mad. She made this statement of her own accord.

Mrs. T. Waters testified, for the defense, that she was the sister of the defendant. On the evening of the alleged offense, a very short time before sundown, the defendant passed the

house of the witness, going towards John Waters's, a quarter of a mile distant. Witness and her little daughter spoke to the defendant at that time. She saw the defendant at John Waters's early the next morning. She knew this to have occurred on the sixth day of June, 1879, as a day or two later she heard that the defendant was accused of attempting to poison his wife.

Cross-examined, the witness repeated her statement as to her means of fixing the day on which she saw the defendant as described. She did not know where he was on the nights of the first, third, fourteenth or thirtieth of June, 1879, but supposed that he was at John Waters's house on those occasions.

Henry Gardner testified, for the defense, that he had sold the defendant a horse, and that the defendant owned the animal on the day of the alleged attempt to poison his wife and the children.

Examined by the State, the witness stated that on the day before the alleged offense the defendant approached him in his field, with the request for the loan of a gun to go deer hunting. The witness could not comply with this request, because he had loaned his gun to John Waters.

Cross-examined by the State, the witness testified that he knew of no ill feeling between the defendant and Sim Turner because of the troubles between the defendant and his wife. He remembered having said to his wife that he did not want to loan his gun to the defendant, because he thought that the defendant would shoot Sim Turner. On the morning after the alleged attempt at poisoning the witness went to Waters for his gun. Waters said that the defendant, who lived with him, took the gun on the day before (which was the day of the alleged attempt), and had gone hunting and had not yet returned.

John Waters, a brother-in-law of the defendant, testified that he lived between twelve and fifteen miles from Mrs. Pinkord's, and that the defendant lived with him. The defendant assisted him in milking on the evening of June 6, 1879, ate supper at his house that night, went to bed there between eight and nine o'clock, and remained all night, getting up from bed early on the morning of the seventh. On the morning of the seventh Gardner came to the witness's house for his gun. The witness told Gardner that the defendant took it and went hunting on the day before, and had not yet returned. This statement was untrue, and was made by the witness at the request of the defend-

ant, to enable the defendant to retain the gun for hunting purposes on the seventh.

On his cross-examination, the witness reiterated his testimony in chief. He denied that on the sixth day of June he told John Murphy that the defendant was going hunting, but did tell him that the defendant spoke of doing so. He did not, on that evening, tell Murphy that the defendant had returned from hunting. When the witness went home to dinner on that day he told the defendant that Murphy requested the witness to bring the gun to the field in order to enable him to get it and take it to Gardner. When the witness went to the field, by request of the defendant he told Murphy that the defendant had gone hunting.

Zack Burns, brother-in-law to Mrs. Pinckord, testified, for the defense, that Mrs. Pinckord came to his house on the morning of June 8, 1879, and after telling him about the strychnine, in the presence of his wife, said that she would like for the witness to get up a crowd and mob the defendant.

In rebuttal, Gardner testified, for the State, that on June 7, 1879, John Waters told him that the defendant had gone hunting on the day before and had not returned.

John Murphy testified, in rebuttal, that John Waters told him in his field, on the morning of June 6, 1879, that the defendant went hunting that morning, but would return by twelve o'clock, when he, Waters, would bring the gun to the witness at the field. Waters again, between one and two o'clock, told the witness that the defendant had not yet returned. He did not say that defendant spoke of going hunting, but said that the defendant had gone hunting.

One of the errors declared by this court is the refusal of the court below to grant a continuance, and its subsequent refusal to grant a new trial in view of the evidence had, and that set out in the motion for continuance. The continuance was asked because of the absence of Mrs. E. J. Waters, Mrs. Hattie Burns, and Dan Nicholas. The diligence shown by the application was, first, the service of subpœna on Mrs. Waters and Mrs. Burns, and their subsequent attachment and release on bond because of sickness. The witness Nicholas was not found, and return was so made on both the subpœna and attachment.

The application set out that it was not made for delay; that the witnesses were not absent by the procurement or consent of the defendant; that there was no reasonable expectation that the attendance of the witnesses could be procured during the

term, and that he expected to procure their attendance by the next term.

The application set out that the defendant expected to prove by Mrs. Waters that the defendant lived at her house, some twelve or fifteen miles from Mrs. Pinckord's; that he ate supper at her house on the night of the alleged offense, and went to bed in a room adjoining hers at about eight o'clock, and remained there until early next morning, when he got up and went hunting.

According to the application, it was expected to prove by Mrs. Hattie Burns that Mrs. M. J. Pinckord had, for three or four months prior to June 6, 1879, the day of the alleged offense, been on unfriendly and hostile terms with the defendant, and had displayed a persistent and determined purpose to do any injury to the defendant possible; that, on the eighth day of June, 1879, Mrs. Pinckord came to her house and tried to prevail upon her husband, Zack Burns, to go with her, Mrs. Pinckord, and assist her in mobbing and procuring the arrest of the defendant.

The application set forth that the defendant expected to prove by the witness Nicholas that, on June 6, 1879, he lived directly on the road between Mrs. M. J. Pinckord's residence, on S. D. Turner's place, and John Waters's. The witness was at home on the evening of June 6, 1879, and would most likely have seen the defendant, had he passed along that road going towards Mrs. Pinckord's. That the tracks followed by D. Turner and T. D. Pace on the morning of June 7, 1879, were not the tracks of the defendant, but were, as the witness verily believed, the tracks of another man whom the witness saw traveling that same road, and in the same direction, on that same morning, before the said Turner and Pace passed following the tracks; that Turner and Pace followed the tracks only about four hundred yards beyond the house of the witness.

The application further alleged that the sickness of Mrs. Waters was of such a dangerous character as to prevent her attendance upon court; Mrs. Burns was in daily expectation of confinement, and Nicholas could not be found.

The motion for new trial raised the questions involved in the rulings of this court, assailed the charge of the trial court, and denounced the verdict as contrary to the law and the evidence.

*J. M. Crosson, Y. S. Hill* and *Davis & Sayles*, for the appellant.

*J. H. Burts,* Assistant Attorney General, for the State.

WHITE, P. J.  In view of the evidence upon which the case was tried, it appears to us that the motion for a new trial should have been granted to enable the defendant upon another trial to produce the absent witnesses whose testimony, as set out in the previously overruled application for continuance, is manifestly important and material, and is not lacking in its probability of truth.  This application was in strict compliance with the terms of the law, and all the diligence required was exercised by defendant to secure the attendance of his witnesses.

In signing the bill of exceptions taken to the overruling of this application, the judge in an explanatory note says that the proposed evidence of Mrs. Waters and Mrs. Burns was simply cumulative of evidence given by each of their husbands, respectively, who testified in the case.  The fact that it was so could only have been known to the court after the application was overruled, and was no reason explaining or justifying the action.  Whether the application was sufficient in law was the question for the court to pass upon when the motion was presented.  In first applications the law never has required, and does not now require the defendant to state "that the testimony cannot be procured from any other source known to defendant."  This statement is only required in applications subsequent to the first. (Code Crim. Proc., Arts. 560, 561.)

That evidence is cumulative where the object sought is to prove an *alibi* is no reason for its exclusion; on the contrary, the greater the number of witnesses to the facts establishing it, the stronger ordinarily would be our reliance upon and conviction of its truth.  As to the absent witness Nicholas, his proposed testimony was of vital importance to the defendant.  One, if not the most damaging, of the inculpatory facts proven against defendant was the finding of tracks around the house corresponding with tracks made, and the size of the shoes worn by defendant.  Two witnesses swear that they followed and traced these tracks some miles on the road leading to the house where defendant resided, and that, whilst so tracing these tracks, they found and picked up the bottle label marked strychnia, and containing directions for its use.  Now, it was proposed to prove by the absent witness Nicholas that he was at his home bordering upon this road; that he saw the two witnesses who were tracking, as they passed by the house, and that the tracks they were following

were not those of defendant; that before they passed he had seen another party, whose tracks he believed them to be, pass in the same direction down the road; and that if defendant had passed he would have seen him, but that he did not see defendant pass. We are of opinion defendant should have the benefit of this testimony, if it can be produced by him.

Several bills of exception were taken to the admission of testimony over objection of defendant.

First: All the proceedings, including the petition, judgment, etc., in a suit wherein defendant's wife had sued and obtained a decree of divorce from him were read by the prosecution in evidence to the jury. As a fact tending to show the feelings and relations of the parties to each other, it was doubtless legitimate to prove that the wife had instituted suit for a divorce prior to, and that the same was pending at, the time it was alleged the crime charged against defendant was committed. But it was error to permit the allegations of her petition for divorce to be read and go as evidence to the jury, and especially so without any explanation or instruction as to how far and for what purpose they were alone to be considered. As to the judgment or decree for divorce, that was clearly inadmissible, because it was rendered several months subsequent to the date of the offense alleged in this case, and could possibly have shed no light upon, or tended to illustrate in the remotest degree, any issuable matter in this case.

Second: Henry Gardner, one of the witnesses, was allowed over objection to testify to a conversation between himself and wife (defendant not being present), that "I (witness) told my wife I did not want Ed. Pinckord to have my gun, because I believed he wanted to borrow my gun and go down and shoot old Sim Turner." "Now it is not only a fundamental, but it is laid down as *the first rule* governing the production of evidence 'that the evidence offered must correspond with the allegations and be confined to the point in issue.' (1 Greenl. Ev., § 50.) This rule excludes all evidence of collateral facts, or those which are incapable of affording any reasonable presumption or inference as to the principal fact or matter in dispute; and the reason is that such evidence tends to draw away the minds of the jurors from the point in issue, and to excite prejudice and mislead them." (Id., sec. 51.; *Cesure* v. *The State*, 1 Texas Ct. App., 19.) Sim Turner was the father-in-law of Mrs. Pinckord, and after she and her husband separated she sought the protec-

tion of, and was living at a house belonging to, said Turner. Such evidence was wholly irrelevant and calculated to prejudice the rights of defendant. All the evidence above discussed was incompetent and improper, and the objections to it should have been sustained. A defendant in a criminal case is entitled to the verdict of a jury upon competent testimony alone. (*Draper* v. *The State*, 22 Texas, 400.)

The judgment of the court below is reversed and the cause remanded for a new trial.

*Reversed and remanded.*

Opinion delivered February 14, 1883.