[No. 2384.]

## LOU ARMSTEAD *v.* THE STATE.

1. MURDER—CONFESSIONS.—It is a well established rule of law that the confessions of an accused can be used only against himself, and that the declarations of a co-conspirator, made in the absence of the defendant, and after the consummation of the conspiracy, are not admissible against the defendant. The acts and declarations of the co-conspirator, made in the defendant's absence, are admissible only if made pending the criminal enterprise. Under this rule the trial court erred in permitting a State's witness to testify that one H., jointly indicted with the defendant on trial, pointed out to the witness, after the homicide, the place where, in the neighborhood of the homicide, the witness found the hull of an empty cartridge that fitted H.'s gun.

2. SAME—EVIDENCE—CASE STATED.—Over the objection of the defendant, the State was permitted to prove that, in the absence of the defendant, and on the night of and just before the killing, H., the co-defendant, gave a dollar to the two children of the deceased and told them that their father, the deceased, would be killed some night, and that they

must maintain that he, H.. was not present at the time of the killing, but had previously left the house. *Held*, that such testimony was competent only upon proof of a pending conspiracy between H. and the defendant to murder the deceased.

3. SAME—PRACTICE.—An exception to the general rule that leading questions can not be propounded to witnesses on the stand, is when the witness is weak minded.

4. SAME.—VERDICT for murder, to support a judgment, must declare the degree of which it finds the defendant guilty. "We, the jury, find the defendant guilty as charged in the indictment, and assess his punishment at confinement in the State penitentiary for life," will not support a judgment of conviction for murder in the first degree.

APPEAL from the District Court of Blanco. Tried below before the Hon. A. W. Moursund.

The indictment in this case was joint against this appellant and Alexander Hardin, charging them with the murder of Sandy Armstead in Blanco county, Texas, on the third day of April 1886. The appellant being alone upon trial was convicted of murder in the first degree, and was awarded a life term in the penitentiary. Appellant was the wife of the deceased.

Emeline Armstead, the daughter of the defendant and the deceased, was the first witness for the State. She testified that she, her father (deceased), her mother (the defendant), her brother Monroe, eleven years old, and her five-year-old sister, lived in the same house in Blanco county, Texas, on the third day of April, 1886. About thirty minutes before sun set the defendant left home, and went to the house of Sam Hinds, a neighbor. Just before dark the deceased left the house to go to the field fence, some four hundred yards distant, to get his pipe, which he had left there. Alex Hardin came to the house from another direction just as the deceased left. He spoke to witness, saying: "Good evening, Lena; here is a dollar for you and Monroe. Your father will be killed some of these nights, and you must say that I was not here, but that I left early." Deceased returned to the house just before dark, and the defendant got back about dark. Supper was prepared and defendant and deceased ate together, Alex Hardin declining to eat upon the plea that he had eaten his supper. Some time after supper the deceased went to bed, leaving the defendant and Alex Hardin in the room, talking about church affairs, the defendant sitting in front of the fire place near a box, and Alex Hardin standing near by. Deceased went to bed, in the bed

which stood in the southwest corner of the room. Witness, her brother Monroe and her sister, retired shortly afterwards to the bed which stood in the southeast corner of the room. Deceased began to snore about fifteen minutes after he retired, at about which time Alex Hardin left.

Some time, perhaps two hours later, the witness, who had not yet fallen asleep, was frightened by the report of a gun fired into the house. She got up and found that the deceased had been shot. Witness could see the deceased's bed from her bed, but, because of an intervening box, could not see his head. After the shooting, the witness saw a hole in the wall of the house directly at deceased's head. The walls of the house had been several times daubed, but the daubing was as often washed out by rain, and the crevices for sometime had been filled with rags. The crack or hole near the deceased's head was found, on the next morning, to be powder-burned. It was not powder-burned on the afternoon before. Some rags were also found on the ground under that hole, and it was the witness's opinion that they were in the hole on the evening before. The killing occurred on Saturday night, at about ten o'clock. On the next day witness told defendant about Alex Hardin giving her and Monroe a dollar, and saying what he did about the deceased going to be killed some night. Defendant said she worked with Alex Hardin on his place a day or two during the previous week.

Cross examined, the witness testified that Hardin came to the house from the north, in the direction of his home, on the evening of the killing. Defendant had then gone to Hind's house, southeast from home, to milk. She was not at home when Hardin gave witness and Monroe the dollar, and remarked that deceased would be killed, etc. Hardin made the remark after he had presented the dollar. He could have seen deceased at that time going to the field fence. When Hardin left he left the defendant sitting in front of the fire place, sewing. She was so engaged at the same place when the fatal shot was fired. The deceased's house "headed" south. The witness was satisfied that the rags were pulled from the hole, or crack in the wall, at the head of defendant's bed, on the night of the shooting.

Sam Hardin was the next witness for the State. He testified that he lived about a mile from the house of the deceased and defendant, and about half that distance from Richardson's house. Witness's son, Alex Hardin, came home about ten

o'clock on the night of the homicide, and waked witness up by the noise he made in getting to bed. A short while later Richardson's two boys came to witness's house and told him of the death of the deceased. Witness got up and dressed, and with George Coffey went to the deceased's house. He found deceased dead in his bed, a gun shot being the cause of his death. No person save the deceased, the defendant and their children were at the house. The clock struck twelve just as witness reached the defendant's house.

Cross examined, the witness stated that he lived north from the house of the deceased. Hinds lived southeast from that house, and the school house was south. In going from witness's house to that of deceased, an almost opposite direction from Hinds's and the school house would have to be traveled. Witness saw the defendant at a church meeting at the school house on the evening before the tragedy. She remained at the meeting from three o'clock until near sun down, and when she left she said she was going to Hinds's to milk. Alex Hardin left witness's house, early on the morning of the fatal Saturday, with the hands to work the road on Miller's creek at a point farther from defendant's place than from witness's. The witness did not see Alex again until he returned and went to bed, about ten o'clock that night. Defendant and Alex worked together, on witness's place, on the Wednesday and Thursday prior to the killing of the deceased.

Jackson Burch testified, for the State, that he went to the deceased's house on Sunday morning, the day after he was killed. Deceased lay in bed with his head to the south. He was shot through the head. It was evident that the fatal shot had been fired through a crack in the south wall of the house, just at the head of the bed. The upper edge of the crack was powder burned. About a year before the killing of the deceased, the witness stopped at deceased's house and heard a quarrel between the deceased and the defendant, Emerson Johnson, Wesley Johnson and Ellen Johnson being also present. During the course of that quarrel defendant said: "Some (or perhaps a parcel) of you negroes will get your brains blown out if you don't quit fooling with me." She was looking at the deceased at the time. Witness, as the pastor of the church, spoke to the defendant about her conduct, and she promised to do better. Defendant was not crying, nor did she otherwise manifest any distress, on the morning after the death of her husband. She did

nothing towards caring for or attending to the body, that the witness saw. She was humming a tune when called before the inquest over the body, to testify.

Cross examined, the witness stated that the inquest over the body was in progress when he arrived at the house of the deceased on Sunday morning. The house was a single room log house. The spaces between the logs had been daubed in, but the daubing had fallen out in places.

John Jackson testified, for the State, that two or three months before the decease of Sandy Armstead, witness and his wife had a conversation with the defendant about the manner in which she and deceased were getting along. In the course of that conversation witness remarked: "A piece of a rail is better than no rail at all, and so a piece of a man on a place is better than no man at all; for he will bring in something." The defendant replied: "No, it would be better for both me and Sandy if he was dead." Witness reached the house of the deceased a little after sun rise on the day after the murder. He did not notice the defendant particularly, but observed that she did not go about the corpse, did not weep, nor did she manifest any distress. She went before the coroner's jury, humming a tune. Witness saw some red jeans rags on the ground outside the house, just under the crack at the head of deceased's bed. They appeared to have been taken from that crack from the outside.

Cross examined, witness said that the deceased and the defendant separated in the winter of 1885, after which, for some time, the defendant stayed at his house, and it was during her stay at his house that she said it would be better for her and deceased if deceased was dead.

Emeline Armstead, recalled by the State, testified that she was asleep when the fatal shot was fired. The deceased was also asleep. Defendant and Alex Hardin were sitting together talking when witness went to sleep. Witness was awakened by the report of the gun. She saw her mother, the defendant, spring from her chair in an apparent fright. She ran to witness's bed and exclaimed: "Lord! Lord! some one has shot in here!" She continued to cry and scream, and went to the bed and called out that deceased was dead.

Cross examined, witness stated that she forgot to state on her first examination that she was asleep when the shot was fired. Witness did not see Alex Hardin leave the house that night, nor

did she see any other person than Alex, save the family, about the house on that day or night.

W. J. Jackson testified, for the State, that he reached the house of deceased and defendant at or near day light on the morning after the murder. Defendant was sitting by the fire, nursing her baby, when witness arrived. Witness asked her who had been on the place during the previous night, and she denied that any one had been there. After talking to her children, witness asked her if Alex Hardin was not there on the night before. She at first denied that he was there, but upon being further pressed, admitted that Alex Hardin was there about sun down, but asserted that he left before dark to go to a church meeting. To witness's question the defendant said that Alex was not at the house when deceased was shot. On the upper edge of the crack through which it was evident the fatal shot was fired, there was an indentation which fitted the sight of Alex Hardin's gun, but which would fit none of the large number of other guns applied to it.

Cross examined, the witness said that Hardin's gun was not found at Hardin's house. Witness permitted no one touch the body of the deceased until the inquest was over. Over the defendant's objection, the witness was permitted to testify that he sent Lee Bramin and Charles Jenkins with Alex Hardin, some days after the killing, to a place near deceased's house, indicated by Hardin, to find a certain cartridge hull. Witness also went along. Alex Hardin pointed out a place, about fifty-five yards from the house, where he said the hull would be found. Jenkins found it at that place.

Monroe Armstead, the eleven year old son of the deceased and the defendant, testified briefly for the State, but in substance the same as did his sister Emeline, except that he stated positively that Alex Hardin left the deceased's house a few minutes before he and his sister retired, which was some time before the fatal shot was fired.

Sheriff Jackson and his deputy, Bramin, identified the cartridge hull in evidence as the one found at the place pointed out by Alex Hardin near the deceased's house, and testified that they inserted the same in Hardin's gun and found it to fit exactly. Hardin's gun, when examined by the witness on Sunday morning, showed that it had been discharged within the preceding twenty-four hours. The State rested.

Ellen Johnson, the first witness for the defense, testified that

defendant was at church meeting pretty much all day on Saturday, the day of the killing, and left about sun down to go to Hinds's to milk. Witness was at defendant's house on the next day, and heard John Jackson tell defendant that if Alex Hardin was at her house on the previous evening, not to admit or acknowledge it.

Sam Hinds testified, for the defense, that defendant, who had been milking at his house on Saturday evening, left about dark to go home.

Anderson McConico testified, for the defense, that he was at the house of the defendant on the Monday before the fatal Saturday night. When deceased started to work defendant asked him what she would do for wood. Deceased, who had no team, replied that he would get Alex Hardin to haul her a load, and she, defendant, could pay the work back to Alex by dropping corn for him. Alex hauled the wood.

Monroe Armstead, for the defense, testified that Anderson McConico was at defendant's house on Monday previous to the fatal Saturday. Witness heard the deceased engage a load of wood from Alex Hardin, but did not know how it was to be paid for. Witness went to bed on the fatal Saturday night before Emeline did, and left Emeline and defendant sitting up in front of the fire place. Hardin left the house just after witness got in bed.

Wesley Johnson, testifying for the defense, referred to the testimony of Jack Burch, and denied that, on the occasion spoken of by Burch, defendant said that " some of you niggers, if you don't look out, will get your brains blown out." No such threat or statement was made by defendant on that occasion. Burch was then pleading with defendant to go back to the deceased. Witness once heard deceased say that Alex Hardin was the son of a b—h who moved his wife from home. He was angry with Alex.

Ellen Johnson, the next witness for the defense, testified in substance as did the witness Wesley Johnson.

Emeline Armstead, for the defense, testified that the defendant, on discovering the death of her husband, screamed and wept violently. Within fifteen minutes she went screaming to Richardson's house, and after a time returned with Emanuel Jackson. This witness positively reasserted that Hardin and defendant were together in the house when she, witness, went to sleep. She went to bed at least thirty minutes after her

brother Monroe retired.  Monroe was asleep when the witness went to bed.

Henry Richardson testified, for the defense, that on the fatal Saturday night the defendant, "snuffling," came to his house, placed her arms around his daughter, and said: "Some one has come up there and killed Sandy." She wanted witness's daughter to go home with her, but, witness's wife objecting, Emanual Jackson went with her instead.  The defense closed.

Susan Burch testified, for the State, that some fifteen months before the assassination of the deceased, she heard the defendant say: "I could, if I would, have Sandy's brains blown out."

The motion for new trial raised the questions discussed in the opinion.

No brief for the appellant has reached the Reporters.

*J. H Burts*, Assistant Attorney General, for the State.

White, Presiding Judge.  Alexander Hardin and appellant were jointly indicted for the murder of Sandy Armstead, who was the husband of this appellant.  On the separate trial of this appellant, the prosecution, over the objection of the defendant, was allowed to prove that subsequent to the killing the co-defendant, Alexander Hardin, was taken by the deputy sheriff, Bramin, to the neighborhood of the place of the killing, and that Hardin pointed out a place to the deputy, near the house of deceased, where the deputy sheriff found the hull of an empty gun cartridge, which fitted Hardin's gun.

It is a general and well established rule of law that a man's confessions or admissions of guilt can only be used against himself (Draper v. The State, 22 Texas, 400), and it is equally as well settled that the declarations of a co-conspirator, made in the absence of the defendant and after the consummation of the conspiracy, are not admissible in evidence against the defendant. (Ricks v. The State, 19 Texas Ct. App., 308.)  Acts and declarations of one co-conspirator are only admissible against another, when such other was not present at the time they were made, in cases where such acts and declarations were made and done during the pendency of the criminal enterprise and in furtherance of its objects.  If they took place at a subsequent period, and are therefore merely narrative of past occurrences, they are to be rejected.  (1 Greenlf. Ev., section 111; Preston v. The

State, 4 Texas Ct. App., 186; Cox v. The State, 8 Texas Ct. App., 256; Smith v. The State, 21 Texas Ct. App., 107; Meyers v. The State, 6 Texas Ct. App., 1; Davis v. The State, 9 Texas Ct. App., 363; Avery v. The State, 10 Texas Ct. App., 199; Cohen v. The State, 11 Texas Ct. App., 153; Morris v. The State, 13 Texas Ct. App., 65; Long v. The State, *Id.*, 211; Holden v. The State, 18 Texas Ct. App., 91.)

The evidence complained of was, under these rules, inadmissible, and the court erred in permitting the prosecution to introduce it over defendant's objection.

Objection was made to the proof the acts and declarations of the co-defendant, Alex Hardin, to Emeline and Monroe Armstead, on the night of and a short time before the killing. It was testified by these children that Hardin had given them a dollar, telling them at the time that their pa would get killed some night, and that he wanted them to tell the folks that he was not there, but left early. Appellant was not present when this occurrence took place. We are of opinion this testimony would be admissible provided the conspiracy between the parties to commit the murder is established; because it would seem, in that event, to be in furtherance of the objects of the conspirators, which would be to prevent discovery of their connection with the crime about to be perpetrated.

As to the action of the court in permitting the prosecution to propound leading questions to the witness, Emeline Armstead, the learned judge says the witness was not bright, and it was almost impossible to obtain the evidence without to some extent leading the witness. An exception to the general rule, that leading questions can not be propounded on direct examination, is where the witness is of weak memory. (Whart. Crim. Ev. eighth edition, section 454*a*). We can perceive no error in this action.

None of the matters complained of in any of the other several bills of exception are deemed material, as presented, and they will not, therefore, be discussed.

There is another matter, however, not mentioned, complained of nor alluded to, which in our opinion constitutes fundamental error, requiring a reversal of the judgment. It is the verdict rendered by the jury, and upon which the judgment is based. We find it copied into the judgment in the following words, viz.: "We, the jury, find the defendant guilty as charged in the in-

dictment, and assess the punishment at confinement in the State penitentiary for life."

It is expressly required by our statute that, "If the jury shall find any person guilty of murder, they shall also find by their verdict whether it is of the first or second degree." (Penal Code, Article 607.) In Buster's case, 42 Texas, 315, where the verdict was, "We, the jury, find the defendant guilty as charged in the indictment, and assess his punishment to be hung by the neck until dead," it was held that the verdict was a nullity and would not support a judgment of conviction for murder of the first degree. (See also Clark's Crim. Law, page 214, note "Verdict.") In Woldridge's case, 13 Texas Court of Appeals, 444, the question is thoroughly discussed, and amongst other conclusions announced is, quoting from Mr. Bishop, that "unless they (the jury) find the degree in a manner patent on the face of the verdict, without help from the particular terms of the indictment, it is void. No judgment can be rendered thereon, but a second trial must be ordered." (2 Bish. Crim. Proc., section 595, and note, with authorities cited; Sanders v. The State, 18 Texas Ct. App.,372; Dubose v. The State, 13 Texas Ct. App., 418.)

For the errors pointed out, the judgment is reversed and the cause remanded.

*Reversed and remanded.*